968 So.2d 637 (2007)
Florida Secretary of State Kurt S. BROWNING, in his official capacity; Kathy Dent, as Supervisor of Elections for Sarasota County, Florida; and Board of County Commissioners of Sarasota County, Florida, Appellants
v.
SARASOTA ALLIANCE FOR FAIR ELECTIONS, INC., a registered Florida political action committee and Florida not-for-profit corporation; Kindra L. Muntz; and Susette Bryan, Appellees.
No. 2D06-4339.
District Court of Appeal of Florida, Second District.
October 31, 2007.
*640 Peter Antonacci and Allen C. Winsor of Gray Robinson, P.A., Tallahassee, for Appellant Florida Secretary of State Kurt S. Browning.
Ronald A. Labasky and John T. LaVia, III, of Young van Assenderp, P.A., Tallahassee, for Appellant Supervisor of Elections Kathy Dent.
Stephen E. De Marsh, County Attorney, Frederick J. Elbrecht, Deputy County Attorney, and Scott T. Bossard, Assistant County Attorney, Sarasota, for Appellant Board of County Commissioners of Sarasota County.
Thomas D. Shults and Zachary L. Ross of Kirk Pinkerton, P.A., Sarasota, for Appellees.
VILLANTI, Judge.
Florida Secretary of State Kurt S. Browning (Secretary Browning), the Board of County Commissioners of Sarasota County (the Board), and Supervisor of Elections for Sarasota County Kathy Dent (Supervisor Dent) appeal a final judgment in a declaratory action which upheld the constitutionality of an amendment to the Sarasota County charter. We have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.030(b)(1)(A).
The challenged amendment was sponsored by the Sarasota Alliance for Fair Elections (SAFE), a political action committee. The amendment set forth detailed election requirements to be implemented in Sarasota County effective January 1, 2008. On appeal, the Board, Secretary Browning, and Supervisor Dent (the Appellants) argue that the proposed amendment is expressly or impliedly preempted by the Florida Election Code, chapters 97 to 106, Florida Statutes (2006). In the alternative, they maintain that either the entire proposed amendment or portions thereof are unconstitutional because they facially conflict with provisions of the Election Code. Finally, Secretary Browning and Supervisor Dent also argue that the proposed amendment is impermissibly vague. The trial court concluded that the general law of the State of Florida did not expressly or impliedly preempt the field of elections and that the proposed amendment did not conflict with general law. We disagree and reverse the trial court's final judgment.

I. THE RECORD ON APPEAL AND THE FINAL JUDGMENT
SAFE sponsored the amendment at issue and collected the necessary signatures *641 to submit it to the electorate. The proposed amendment provides:
Section 6.2A. Voter Verified Paper Ballot.
(1) No voting system shall be used in Sarasota County that does not provide a voter verified paper ballot. The voter verified paper ballots shall be the true and correct record of the votes cast and shall be the official record for purposes of any audit conducted with respect to any election in which the voting system is used. While votes may be tallied electronically, subject to audit, no electronic record shall be deemed a ballot.
(2) Any electronic voting machine shall allow the voter to correct his or her ballot by rejecting overvoted ballots at the time of voting, when voting in person at the polling place.
6.2B. Mandatory Audits. In addition to Voting System Audits allowed in F.S. 101.591, the Sarasota County Supervisor of Elections shall provide for mandatory, independent, random audits of the voting system in Sarasota County. These audits shall consist of publicly observable hand counts of the voter verified paper ballots in comparison to the machine counts. The audits shall be conducted on Election Day or within 24 hours after the closing of the polls, in clear public view, by a reputable, independent and nonpartisan auditing firm. These audits shall be conducted for a minimum of 5% of Sarasota County precincts, for 100% of the ballot issues in the selected precincts; and for a minimum of 5% of the total ballots cast in Early Voting periods, 5% of the total Absentee ballots, and 100% of any precinct where there are highly unusual results or events. In addition, audits of 5% of Provisional ballots shall be completed by the 3rd day following the election, and audits of 5% of Military and Overseas (UOCAVA) ballots shall be completed within 24 hours of a primary election and within 10 days following a general election. The random selection of precincts to be audited shall be made in a physical, non-electronic, public drawing at the Supervisor of Elections Office only AFTER machine tallies from the precincts have been made public. This public drawing shall be made on an entirely random basis using a uniform distribution in which all precincts in the County have an equal chance of being selected. If machine counts are unavailable for any reason, the voter verified paper ballots shall be counted by hand by the independent auditors and recorded as the vote count for that precinct. Immediately upon completion of the audit, the persons conducting the audit shall furnish a copy of an audit to the Supervisor of Elections and the Board of County Commissioners and post the results for public view and copying at the Supervisor of Elections Office. The audit shall be considered a Florida public record pursuant to Florida Statute 119.
6.2C. Certification of Election Results. No election shall be certified until the mandatory audits are complete and any cause for concern about accuracy of results has been resolved. Any discrepancies between machine counts and hand counts greater than 1% or, if less than 1% but sufficient to change the outcome of any measure, shall initiate a comprehensive manual audit of the voter verified paper ballots in all precincts and of all Absentee, Provisional, and Military and Overseas (UOCAVA) ballots. Such comprehensive manual audit shall be completed within 5 days after the election, with the exception of comprehensive audits of Military and Overseas ballots, which shall be completed within 5 days after a primary election, and within 10 days after a general election. Audits *642 shall be completed by a reputable, independent and non-partisan auditing firm as in 6.2B above. A copy of these audits shall be retained for public view and copying at the Supervisor of Elections Office in addition to being given the County Commissioners. These audits shall be considered Florida public records pursuant to Florida Statute 119.
On August 22, 2006, the Board filed a complaint seeking a declaration of the constitutionality of the proposed amendment.[1] The Board was concerned that the amendment was preempted by state law or conflicted with state law. The following day, SAFE filed a petition for emergency writ of mandamus and other relief, seeking an order compelling the Board to include the amendment on the November 2006 election ballot. The two actions were consolidated, and on September 6, 2006, without any objections from the parties, the court held an evidentiary hearing.[2] On September 13, 2006, the trial court issued its final judgment and ordered the Board to place the amendment on the ballot. Pertinent to this appeal, the final judgment held:
1. The general law of the state does not expressly or impliedly preempt the field of elections so that Sarasota County cannot act on the proposed charter amendment.
2. The proposed charter amendment and the general law of Florida do not conflict such that compliance with one would result in violation of the other.[[3]] It is from this judgment that the Board, Secretary Browning, and Supervisor Dent appeal.[4]

II. THE FLORIDA ELECTION CODE
To assess the Appellants' argument that the Election Code preempts the entire field of elections or that the amendment conflicts with the Election Code, it is necessary to examine the Election Code.
The Florida Constitution outlines the legislature's duty to safeguard the electoral process in Florida. Article VI, section 1 of the Florida Constitution, entitled "Regulation of elections," provides: "Registration and elections shall . . . be *643 regulated by law." "Under this provision, the Legislature is directed to enact laws regulating the election process." AFL-CIO v. Hood, 885 So.2d 373, 375 (Fla.2004). The Florida Legislature has enacted the Election Code.
Chapters 97 to 106, Florida Statutes (2006), constitute the Election Code. See § 97.011. Its expressed intent is to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws." § 97.012(1). The Election Code provides that "no vote shall be received or counted in any election, except as prescribed by this code." § 101.041.
The Election Code's ten chapters and 125 pages extensively regulate the conduct of elections. Chapter 97 controls voter qualification and registration. Chapter 98 establishes the procedures to elect local supervisors of elections, as well as their tenure, compensation, and duties. Chapter 99 regulates the eligibility of candidates seeking public office. Chapter 100 contains provisions for the conduct of general, primary, special, bond, and referendum elections and uniformly regulates the opening and closing of polls and the timing of elections. The next two chapters of the Election Code, chapters 101 and 102, are the ones primarily affected by the SAFE amendment.
Notably, chapter 101, which consists of twenty-nine pages, is the second longest chapter of the Election Code, surpassed only by chapter 106, addressing campaign financing. Chapter 101 contains detailed provisions regulating voting methods and procedures. Specifically, sections 101.001 and 101.002 confer upon the local boards of county commissioners the responsibility for creating and changing voting precincts. Section 101.043 describes the types of identification that voters must present at the polls to obtain a ballot. Section 101.031(2) sets forth what documents must be posted at polling places. This chapter also sets forth the procedures to handle provisional ballots (§§ 101.048-.049), early voting (§ 101.657), overseas ballots (§§ 101.6951, .6952), and absentee ballots (§§ 101.6105, .62, .64, .655, .661, .662, .663, .67, .68, .6921, .6923, .6925, .698). Section 101.051 outlines the procedures to handle electors' requests for assistance with ballots. Section 101.111 sets forth the procedures to challenge a person's right to vote. Section 101.131 provides directives for poll watchers' conduct. Section 101.151 provides instructions regarding the content and style of ballots. Section 101.015 also sets forth standards for voting systems to be used in Florida. Importantly, while chapter 101 confers upon local supervisors of elections authority to draft procedures to ensure accuracy and security in their respective counties, it requires that such procedures be reviewed by the Department of State. See § 101.015(4)(b)-(c). Section 101.015(3) also gives the Department of State authority to adopt rules intended "to achieve and maintain the maximum degree of correctness, impartiality, and efficiency of the procedures of voting," including the counting, tabulating, and recording of votes.
Chapter 101 further sets forth procedures for the canvassing of votes, and the Department of State is given authority to adopt rules to safeguard the counting of votes. § 101.5614(2). This chapter also provides for testing of voting equipment before the election to ensure its accurate functioning (§ 101.5612), as well as examination of the voting equipment during voting (§ 101.5613) and postelection (§§ 101.591, .595).
Chapter 102 contains procedures for conducting elections and ascertaining election results. Specifically, sections 102.012 to 102.014 confer upon local supervisors of elections certain powers to appoint election *644 boards, recruit poll workers, and conduct training. Section 102.031 sets forth whose presence is permitted in polling rooms and voting areas. Section 102.141 dictates the duties of local county canvassing boards, as well as who shall serve on those boards. Most important to the issues on appeal, sections 102.071, 102.131, and 102.151 set forth detailed procedures for the canvassing and certification of election results  from how to tabulate and certify votes to when election results must be submitted to the Department of State. Sections 102.141(6) and 102.166 set forth when recounts are required. Notably, no section of the Election Code grants counties authority to establish their own procedures regarding the counting, recounting, and auditing of votes or for certifying election results.
Chapter 103 addresses presidential electors, political parties, and executive committees and members, while chapter 104 provides penalties for violations of the Election Code. Chapter 105 addresses nonpartisan elections, and chapter 106 regulates campaign financing.
Moreover, pursuant to section 97.012(1), which grants the Secretary of State authority to "adopt by rule uniform standards for the proper and equitable interpretation and implementation" of the Election Code, the Department of State has adopted thirty-five rules related to the conduct of elections. See Fla. Admin. Code R. 1S-2.0001 to 1S-2.040, 1S-5.001, 1S-9. Pursuant to these rules, the Division of Elections may render advisory opinions as to whether proposed actions could violate Florida's election law.[5]See Fla. Admin. Code R. 1S-2.010.
Similarly, Florida Administrative Code Rule 1S-2.013 regulates absentee ballots to overseas electors. Rule 1S-2.013(7) provides that absentee ballots postmarked by the date of the election "shall be counted if received no later than 10 days from the date of the Federal election." Further, rule 1S-2.031 sets forth the procedures to conduct ballot recounts, and rule 1S-2.027 sets forth specific standards to follow in order to determine voter intent during state-mandated manual recounts.

III. ANALYSIS
There are "`two separate and distinct ways'" in which a local government enactment may be inconsistent with state law. Lowe v. Broward County, 766 So.2d 1199, 1206 (Fla. 4th DCA 2000) (quoting Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Tallahassee Med. Ctr., Inc., 681 So.2d 826, 831 (Fla. 1st DCA 1996)). A local government enactment may be inconsistent with state law if: (1) "the legislature `has preempted a particular subject area'" or (2) the local enactment conflicts with a state statute. Lowe, 766 So.2d at 1206-07 (quoting Tallahassee Mem'l Reg'l Med. Ctr., 681 So.2d at 831). The Board, Secretary Browning, and Supervisor Dent first argue that the Election Code preempts the field of elections. We agree, but only on the basis of implied preemption.

IV. PREEMPTION
Florida law recognizes two types of preemption: express and implied. Express preemption requires a specific legislative statement; it cannot be implied or inferred. See City of Hollywood v. Mulligan, 934 So.2d 1238, 1243 (Fla.2006); Phantom of Clearwater, Inc. v. Pinellas County, 894 So.2d 1011, 1018 (Fla. 2d DCA 2005) ("Express preemption of a field by *645 the legislature must be accomplished by clear language stating that intent."); Santa Rosa County v. Gulf Power Co., 635 So.2d 96, 101 (Fla. 1st DCA 1994) (finding express preemption based on the following language of section 364.01(2), Florida Statutes (1989): "It is the legislative intent to give exclusive jurisdiction in all matters set forth in this chapter to the Florida Public Service Commission. . . ."). Express preemption requires that a statute contain "specific language of preemption directed to the particular subject at issue." Santa Rosa County, 635 So.2d at 101 (citing Hillsborough County v. Fla. Rest. Ass'n, 603 So.2d 587, 590 (Fla. 2d DCA 1992)). Surprisingly, the Election Code does not contain explicit language setting forth express preemption. Although the Appellants point to miscellaneous statutory and constitutional provisions evincing strong mandates regarding legislative duty and the need for uniformity in conducting elections and counting votes, these provisions do not contain "specific language" expressly setting forth preemption. Therefore, we conclude that express preemption does not apply. However, the absence of express preemption does not preclude a finding of preemption by implication. See Barragan v. City of Miami, 545 So.2d 252, 254 (Fla.1989) (noting that "preemption need not be explicit so long as it is clear that the legislature has clearly preempted local regulation of the subject").
"Implied preemption is actually a decision by the courts to create preemption in the absence of an explicit legislative directive." Phantom, 894 So.2d at 1019. Preemption is implied "when the `legislative scheme is so pervasive as to evidence an intent to preempt the particular area, and where strong public policy reasons exist for finding such an area to be preempted by the Legislature.'" Id. (quoting Tallahassee Mem'l Reg'l Med. Ctr., 681 So.2d at 831). Implied preemption is found where, because of the pervasiveness of the state legislative scheme, local legislation would present the danger of conflict between local and state law. Tribune Co. v. Cannella, 458 So.2d 1075, 1077 (Fla.1984) (finding that the legislative scheme of the Public Records Act preempted the law relating to production of records for inspection); Fla. Rest. Ass'n, 603 So.2d at 590-91 (finding no preemption where state law addressed food protection, alcohol packaging, and sales and where local law required posting of signs about the health dangers of drinking alcohol).
Preemption "`may be implied from the nature of the subject matter being regulated and the purpose and scope of the State legislative scheme, including the need for State-wide uniformity in a given area.'" Halpern v. Sullivan County, 171 A.D.2d 157, 574 N.Y.S.2d 837, 838 (N.Y.App.Div.1991) (quoting Albany Area Builders. Ass'n v. Town of Guilderland, 74 N.Y.2d 372, 547 N.Y.S.2d 627, 546 N.E.2d 920, 922 (1989)); see generally Lowe, 766 So.2d at 1204-05 (noting that a matter of statewide concern is not the proper subject of a charter government's local legislation). In determining implied preemption, courts look at the comprehensiveness with which the legislature has legislated the particular field. See, e.g., Tribune Co., 458 So.2d at 1077 (holding that the legislative scheme of the Public Records Act preempted the law relating to producing records for inspection). "When courts create preemption by implication, the preempted field is usually a narrowly defined field, `limited to the specific area where the Legislature has expressed [its] will to be the sole regulator.'" Phantom, 894 So.2d at 1019 (quoting Tallahassee Mem'l Reg'l Med. Ctr., 681 So.2d at 831).
*646 In any preemption case, the court must look "`to the provisions of the whole law, and to its object and policy.'" State v. Harden, 938 So.2d 480, 486 (Fla. 2006) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). The object sought to be attained by the statute at issue and the character of the obligations imposed by the statute should be considered in determining whether implied preemption applies. See id. (discussing federal preemption).
It generally serves no useful public policy to prohibit local government from deciding local issues. For example, the need to control the sale of fireworks in a populated locality may be greater than the need to control the sale of fireworks in a sparsely populated county. See Phantom, 894 So.2d at 1011 (finding no preemption of local ordinance regulating businesses that sold fireworks). Likewise, the need to control sand dune rehabilitation efforts may be greater in some counties than in others. See GLA & Assocs., Inc. v. City of Boca Raton, 855 So.2d 278, 280 (Fla. 4th DCA 2003) (finding that statute regulating state permits for dune rehabilitation projects did not preempt local ordinance regulating coastal construction permits). Therefore, in considering the application of implied preemption, courts have looked at whether the local law at issue "regulates an area in which some local control has traditionally been allowed" and whether chaos and confusion would result from having the two-tiered regulatory process that would result if local laws were not preempted by state law. Allied Vending, Inc. v. City of Bowie, 332 Md. 279, 631 A.2d 77, 87 (1993).
Our review of the provisions of the Election Code and the proposed SAFE amendment leads us to conclude that the Election Code impliedly preempts the SAFE amendment given the Election Code's pervasive regulatory scheme and the public policy mandate for uniformity. Pursuant to the Florida Constitution, the legislature has been directed to enact laws regulating the election process. See Art. VI, § 1, Fla. Const.; Hood, 885 So.2d at 375. Florida's legislature has enacted the Election Code, which is intended to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws." § 97.012(1). "[N]o vote shall be received or counted in any election [in Florida], except as prescribed by" the Election Code. § 101.041. As set forth throughout, the Election Code contains detailed provisions covering every aspect of the electoral process. The Election Code's ten chapters and 125 pages establish a detailed and comprehensive statutory scheme for the regulation of elections in Florida, thereby evidencing the legislature's intent to preempt the field of elections law, except in those limited circumstances where the legislature has granted specific authority to local governments.[6] We recognize that if a court imposes implied preemption, it must be applied as narrowly as possible. Phantom, 894 So.2d at 1019. However, the Election Code is so pervasive that there are no narrow grounds within which any portion of the SAFE amendment could harmoniously co-exist. *647 See Lozano v. City of Hazleton, 496 F.Supp.2d 477, 521 (M.D.Pa.2007) (holding that "[w]here field preemption[[7]] is present[,] `the subject matter of the federal and local laws is such that the two laws or regulatory schemes must inherently either conflict or be duplicative. That is, under this test it is impossible to have local regulation in the subject area that does not conflict with or duplicate federal regulation.'" (quoting Rogers v. Larson, 563 F.2d 617, 621 (3d Cir.1977))).
The Election Code charges the Secretary of State with responsibility for obtaining and maintaining "uniformity in the interpretation and implementation of the election laws." § 97.012(1). The Secretary is given authority to enact rules to achieve that goal, and to date, thirty-five such rules have been enacted. See Fla. Admin. Code Chapter 1S-2, Elections. The Election Code and its related administrative rules comprehensively regulate all subjects related to elections in Florida, from the qualifications of electors to the counting and certifying of votes to procedures for challenging election results. This pervasive state control of the election process is a compelling indicator that the legislature did not intend for local governments to enact their own individual election laws. See County Council v. Montgomery Ass'n, 274 Md. 52, 333 A.2d 596, 600 (1975) (finding implied preemption of the election campaign financing field and rejecting argument that a local ordinance simply "supplemented" the state election code). The legislature has enacted the Election Code with such detailed depth and breadth that its intent to occupy the entire field is forcefully implied. See id. (noting that "ordinances which deal with an area in which the Legislature has acted with such force that an intent by the State to occupy the entire field must be implied, are invalid" (citing City of Baltimore v. Sitnick, 254 Md. 303, 255 A.2d 376, 385 (1969))).
Strong public policy reasons exist for finding preemption in the field of election laws, given past history and the potential statewide and nationwide consequences of voting, counting, recounting, certification, and canvassing of votes. It is difficult to imagine an area with stronger public policy reasons for finding preemption. The regulation of voting cannot be given unequal application in different parts of the state. Allowing local governments to draft their own laws regarding the conduct of elections; the counting, recounting, or auditing of votes; or the certification of elections would contradict the Election Code's stated goal of obtaining and maintaining "uniformity in the interpretation and implementation of the election laws." § 97.012(1). Moreover, if the SAFE amendment were upheld, a dual system of regulating the counting, recounting, auditing, and certifying of votes would exist in Sarasota County. Such a two-tiered process would invite chaos and confusion. See Allied Vending, Inc., 631 A.2d at 77; County Council, 333 A.2d at 602. The chaos and confusion would be compounded if other counties enacted their own local laws relating to the counting, recounting, auditing, and canvassing of votes. See Allied Vending, Inc., 631 A.2d at 77. Thus, the need for uniformity in the application and implementation of election laws cannot be overemphasized.
Furthermore, the SAFE amendment attempts to regulate an area in which no local control has traditionally been allowed. Issues associated with the counting, recounting, auditing, canvassing, and certification *648 of votes are not issues that affect different counties differently. Therefore, there is no public policy reason for local governments to address voting issues differently in different parts of the state. The proposed SAFE amendment serves no significant local interest relating to voting that may differ from one county to another. SAFE has not demonstrated that Sarasota County's interest in accurate voting systems, audits, recounts, and canvassing and certification of votes in statewide or national elections should be more significant than the interests of other counties in Florida. See Polis v. City of La Palma, 10 Cal.App.4th 25, 12 Cal.Rptr.2d 322, 325 (1992) (finding preemption of local election law where "there is nothing peculiar about La Palma to suggest that interest in term limits is more significant there than elsewhere").
SAFE's reliance on this court's opinion in Phantom is misplaced. The statute at issue in Phantom regulated the sale and use of fireworks, while the ordinance challenged in that case regulated businesses selling fireworks. Phantom, 894 So.2d at 1015, 1018. More importantly, the statute in Phantom specifically delegated to local governments the power to enforce the statute at issue. Id. at 1019. The statute at issue was only three pages long and merely: (1) defined the term "firework"; (2) required the registration of entities that manufactured and sold fireworks; and (3) generally prohibited the use or sale of fireworks, subject to specific exceptions. Id. at 1019-20. Based on those facts, we concluded that the legislative scheme of chapter 791 was not pervasive, nor was there a public policy reason to presume preemption, and local government could enact an ordinance regulating businesses that sold fireworks, providing the local law did not conflict with chapter 791. Id. at 1020. The statute at issue in Phantom did not "compare in length or substance" to the Election Code. Id. at 1019.
We also note that even if the SAFE amendment were arguably "better" than state election laws, the need for uniformity and the potentially chaotic effect of local regulation in conjunction with state legislation outweighs any possible benefits of local laws on the same subject. Indeed, it is the danger such an ad-hoc approach could cause, and not whether a danger will necessarily transpire, that is relevant in preemption analysis. See Tribune Co., 458 So.2d at 1077 (noting that "`a subject is preempted by a senior legislative body . . . if the senior legislative body's scheme of regulation . . . is pervasive and if further regulation . . . by the junior legislative body would present a danger of conflict with that pervasive regulatory scheme'") (quoting Tribune Co. v. Cannella, 438 So.2d 516, 525 (Fla. 2d DCA 1983) (Lehan, J., dissenting)). Once preemption is found, the lesser government cannot overrule the senior government on the same issue. Stated another way, "any additions added by local governments would be either in conflict with the law or a duplication of its terms  the very definition of field pre-emption." Lozano, 496 F.Supp.2d at 523 (emphasis added).
Finally, the administrative "construction of a statute by the agency charged with its enforcement and interpretation is entitled to great weight." PW Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla.1988); see also Harloff v. City of Sarasota, 575 So.2d 1324, 1327 (Fla. 2d DCA 1991). The Election Code confers upon the Secretary of State the responsibility for uniformly implementing the state's election laws. § 97.012. Notably, Secretary Browning, the Board, and Supervisor Dent  all those charged with enforcing the Election Code and the proposed amendment  assert that the SAFE *649 amendment cannot be carried out without conflicting with the Election Code. Their interpretation is entitled to deference because they are charged with responsibility for enforcing the laws at issue. See GLA & Assocs., 855 So.2d at 282 (giving considerable deference to the Department of Environmental Protection's position regarding a local ordinance). If election laws are to be uniformly applied throughout the State, the Secretary's position regarding local efforts to intervene in election laws must be considered. For all these reasons, we find merit in the Appellants' argument that Florida election laws would not be uniform if the interpretation and implementation of procedures relating to audits, recounts, and canvassing of votes were left to each county. We now turn to conflict analysis, which unlike preemption requires actual conflict in order to apply.

V. CONFLICT WITH ELECTION CODE
As an alternative, the Board, Secretary Browning, and Supervisor Dent argue that the SAFE amendment conflicts with the Election Code. We agree. Ordinarily, our reversal on preemption grounds would obviate the need to address alternative arguments for reversal. However, we address the issue of conflict due to the likelihood of further appellate review.[8] The issue of conflict further supports reversal.
Local government cannot adopt a local law that conflicts with a state statute. Phantom, 894 So.2d at 1020. The test for conflict is whether "in order to comply with one provision, a violation of the other is required." Id. We find that the SAFE amendment conflicts with a number of provisions of the Election Code.
A. Section 6.2A of the Amendment
The first section of the SAFE amendment, Section 6.2A, requires a "Voter Verified Paper Ballot." We note that on May 21, 2007, the legislature enacted Chapter 2007-30, Laws of Florida, which provides that all voting in Florida must be on paper ballots effective July 1, 2008. Therefore, the touchscreen voting machines sought to be eliminated by the SAFE amendment will no longer be permitted in Florida.[9]
B. Sections 6.2B and 6.2C of the Amendment
Sections B and C of the SAFE amendment conflict with the Election Code. The second section of the SAFE amendment imposes extensive postelection auditing requirements. The amendment calls for mandatory, independent, and random audits, including hand counts, to be *650 conducted by a "reputable, independent and nonpartisan auditing firm," within twenty-four hours after the closing of the polls. It requires at least 5% of all precincts to be selected for audit, and there must be a hand recount of all ballots in those selected precincts. In addition, it requires an audit of 5% of the early voting ballots, absentee ballots, overseas ballots, and provisional ballots. Finally, the amendment mandates an audit of all ballots from "any precinct where there are highly unusual results or events." The amendment does not define what constitutes "highly unusual results or events."
Pursuant to the third section of the SAFE amendment, no election can be certified until the mandatory audits are completed and until "any cause for concern about accuracy of results has been resolved." The amendment does not define what constitutes a "cause for concern about accuracy of [the] results." Also pursuant to the third section of the amendment, if any discrepancy between machine counts and hand counts is greater than 1%, or greater than the amount necessary to change the outcome of the election, a "comprehensive manual audit of the voter verified paper ballots in all precincts" must be completed within five days of the election.
As the Board has pointed out, the SAFE amendment's mandatory audit requirement conflicts with the version of section 101.591(1) of the Election Code that was in effect in 2006. That section stated:
The Legislature, upon specific appropriation and directive, may provide for an independent audit of the voting system in any county. Within 30 days after completing the audit, the person conducting the audit shall furnish a copy of the audit to the supervisor of elections and the board of county commissioners.
§ 101.591(1), Fla. Stat. (2006). The 2006 Election Code clearly left it to the legislature to decide whether to order an independent audit of a county's voting system. Therefore, the SAFE amendment's mandatory audit requirement conflicted with the prior section 101.591(1) by usurping the legislature's authority and dictating that voting system audits must be conducted in Sarasota County in every election.
Further, in May 2007, the legislature revised section 101.591 to dictate exactly when and how to conduct any independent audits. § 101.591(1)-(5), Fla. Stat. (2007).[10] Section 101.591, entitled "Voting system audit," now requires that the county canvassing board conduct a manual audit of the voting systems used in randomly selected precincts. This manual audit must take place immediately following certification of the elections. The statute sets forth the procedures for this manual audit. The audit must be completed, and the results made public, no later than the seventh day following certification of the election. The audit shall consist of a manual tally of the votes cast in one randomly selected race. The tally sheet shall include at least 1%, but no more than 2%, of the precincts chosen at random by the county canvassing board. This new version of section 101.591 of the Election Code also grants the Department of State *651 authority to adopt rules to implement the audit requirements. The SAFE amendment conflicts with the 2007 amendments to the Election Code in many ways, including the timing of audits (immediately after closing polls versus immediately after certification of an election), the percentages of ballots to be audited (5% of precincts versus no more than 2% of precincts), the designation of who selects precincts for auditing (a "reputable, independent and nonpartisan auditing firm" versus the county canvassing board), and the manner in which the audits will be conducted (a "reputable, independent and nonpartisan auditing firm" versus the county canvassing board). Moreover, the fact that the legislature has enacted a process for conducting mandatory voting system audits strongly suggests that counties are not authorized to create their own, separate voting system audit laws. When the legislature has described the particular situation in which a set of procedures should apply, an inference must be drawn that what is not included by specific reference was intended to be excluded. See Citizens for Responsible Growth v. City of St. Pete Beach, 940 So.2d 1144, 1150 (Fla. 2d DCA 2006) (noting that when interpreting a statute, the "`express mention of one thing is the exclusion of another'" (quoting Inman v. State, 916 So.2d 59, 61 (Fla. 2d DCA 2005))). Therefore, audits other than those outlined by section 101.591 conflict with the Election Code and are not permissible.
In addition, section 101.572 of the Election Code, styled "Public Inspection of Ballots," provides that no person other than the supervisor of elections, the supervisor's employees, or the county canvassing board can handle official ballots. Yet, Sections 6.2B and 6.2C of the SAFE amendment provide for audits conducted "by a reputable, independent and nonpartisan auditing firm." Thus the amendment would allow individuals other than a supervisor of elections, his or her employees, or the county canvassing board to handle ballots, in violation of Florida law. Equally troublesome is the fact that the amendment's mandatory audits would be occurring at the same time as the official counting of ballots. Having two different sets of people handling the same ballots around the same time and under concurrent time constraints creates the potential for chaos and confusion.
Moreover, Section 6.2B of the SAFE amendment provides that "[i]f machine counts are unavailable for any reason, the voter verified paper ballots shall be counted by hand by the independent auditors and recorded as the vote count for that precinct." This directly conflicts with the Election Code, which expressly confers upon the county canvassing boards the sole responsibility for tabulating votes and transmitting the election results to the Department of State. §§ 102.071, .112, .151. Under Florida law, the county canvassing boards are responsible for recording and transmitting the vote results for each precinct.
The Board also correctly points out that conflict exists in connection with the manner and timing in which audits must be conducted. Section 6.2B of the SAFE amendment requires that audits of 5% of provisional ballots be completed by the third day following an election and audits of 5% of military and overseas ballots be completed within twenty-four hours of a primary election and within ten days following a general election. Yet the Election Code as it was in effect in 2006 provided that those who cast provisional ballots had until 5 p.m. on the third day following the election to present evidence supporting *652 their eligibility to vote. § 101.048(1).[11] Likewise, Florida Administrative Code Rule 1S-2.013(7) provides that overseas absentee ballots shall be counted as long as they are received by the tenth day following election. Therefore, because compliance with the outer limits of the Election Code's timeframe leaves no time to complete the SAFE amendment's audits, the provisions of the SAFE amendment, the Election Code, and attendant regulations seem to conflict.
The Appellants also point out that section 102.141(6)[12] of the Election Code sets forth when recounts are required and that the SAFE amendment conflicts by mandating its own recount procedures. We agree. While SAFE has argued that the SAFE audits are not recounts, the following facts strongly suggest that the "audits" in Sections 6.2B and 6.2C are really recounts: (a) the amendment refers to "hand counts" of the ballots, (b) these "hand counts" must begin within twenty-four hours after closing of the polls, and (c) no election can be certified until the SAFE audits are completed and until "any cause for concern about accuracy of results has been resolved." Further, the SAFE amendment provides that any discrepancies between machine counts and hand counts greater than 1%, or if less than 1% but sufficient to change the outcome of the election, require a comprehensive manual audit of the paper ballots in all precincts and of all absentee, provisional, and military and overseas ballots. The SAFE "audits" become a mandatory requirement before any election in Sarasota County can be certified. These audits conflict with the Election Code's provisions, which establish when machine and manual recounts are mandated. See § 102.166.
We are also concerned by the amendment's provisions delaying certification of election results in Sarasota County until completion of the SAFE audits. This seems to be in tension with the Election Code's strict deadlines for certification of election results by the eleventh day following a general election.[13]See §§ 102.112(2), .141(6).
Under the SAFE amendment, no election results can be certified in Sarasota County until an "independent and nonpartisan auditing firm" completes the mandatory audits and "any cause for concern about accuracy of results has been resolved."[14] This conflicts with the Election Code, which establishes who must certify election results (the county canvassing board, not an "independent and nonpartisan auditing firm") and when those results must be certified (by the eleventh day after the general election). See § 102.112(2); see also Division of Elections *653 Advisory Opinion, DE 06-11, Aug. 25, 2006, http://election.dos.state.fl.us/opinions/new/2006/de0611.pdf (stating that "[i]t is imperative that the canvassing board in no way abdicates its statutory duties and responsibilities under the Florida Election Code to be the final authority on whether a voter signature matches for purposes of canvassing the ballots").
Finally, the regulations enacted pursuant to the Election Code provide detailed procedures for conducting recounts and for ascertaining voters' intent. See Fla. Admin. Code R. 1S-2.027, 1S-2.031. The SAFE amendment conflicts with the Election Code and its attendant regulations because it mandates audits conducted by "reputable, independent and nonpartisan auditing firms" but does not require those "independent auditors" to follow the administrative rules enacted by the Division of Elections.
Local legislation that "supplements a statute's restriction of rights may coexist with that statute, whereas an ordinance which countermands rights provided by statute must fail." City of Miami Beach v. Rocio Corp., 404 So.2d 1066, 1070 (Fla. 3d DCA 1981) (citations omitted). While SAFE's goal in attempting to ensure vote accuracy may be similar to the Election Code's goal, the method SAFE has proposed to achieve that goal conflicts with the Election Code. Under these circumstances, similarity of purpose does not preclude a finding of preemption conflict. See Lozano, 496 F.Supp.2d at 524-26. "`If conflict arises, state law prevails.'" Citizens for Responsible Growth, 940 So.2d at 1147 (quoting W. Palm Beach Ass'n of Firefighters, Local Union 727 v. Bd. of City Comm'rs, 448 So.2d 1212, 1215 (Fla. 4th DCA 1984)). A local government "`cannot forbid what the legislature has expressly licensed, authorized or required, nor may it authorize what the legislature has expressly forbidden.'" Thomas v. State, 614 So.2d 468, 470 (Fla.1993) (quoting Rinzler v. Carson, 262 So.2d 661, 668 (Fla.1972)). Even home rule counties such as Sarasota may not ignore this doctrine. See art. VIII, § 1(g), Fla. Const. ("Counties operating under county charters shall have all powers of local self-government not inconsistent with general law. . . . The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law." (emphasis added)). For all the reasons stated, we are inexorably compelled to find that contrary to SAFE's argument, its amendment does not parallel or complement the Election Code, but rather conflicts with it.

VI. CONCLUSION
We note that despite its inability to prevail on appeal, SAFE has advanced noteworthy reforms, one of which has since been adopted by the Florida Legislature  the paper ballot requirement. See ch.2007-30, § 6, at 6, Laws of Fla. (2007). We commend SAFE for its efforts to uphold the integrity of the voting process and protect each individual's vote. Nevertheless, because of the pervasiveness of the Election Code, the important public policy of election law uniformity, and the statewide and potentially nationwide consequences of enactments relating to the canvassing of votes, preemption precludes the SAFE amendment from becoming effective. Accordingly, we hold that the SAFE amendment is unconstitutional.[15] We believe *654 that any efforts to modify or "finetune" Florida's election laws should be addressed through uniform, statewide legislation.
Because this appeal raises an issue of first impression involving whether Florida's Election Code may be subject to sixty-seven variations in each of Florida's sixty-seven counties, we certify the following question to the Florida Supreme Court as a matter of great public importance:
IS THE LEGISLATIVE SCHEME OF THE FLORIDA ELECTION CODE SUFFICIENTLY PERVASIVE, AND ARE THE PUBLIC POLICY REASONS SUFFICIENTLY STRONG, TO FIND THAT THE FIELD OF ELECTIONS LAW HAS BEEN PREEMPTED, PRECLUDING LOCAL LAWS REGARDING THE COUNTING, RECOUNTING, AUDITING, CANVASSING, AND CERTIFICATION OF VOTES?
Reversed and remanded with directions to vacate the trial court's final judgment. Question certified.
WALLACE, J., Concurs.
DAVIS, Judge, Dissents with opinion.
DAVIS, Judge, Dissenting.
I respectfully dissent from the conclusion reached by the majority. Although I agree with the majority that the charter amendment is not barred by specific legislative preemption, I disagree with the remainder of the reasoning and conclusions of law expressed in the majority opinion.
The issue placed before the trial court, and accordingly before this court, is a very narrow one. SAFE proposed an amendment to the Sarasota County Charter that would (1) limit the types of voting machines that could be used in elections held in Sarasota County and (2) require the results of the electronic vote count in such elections to be audited prior to certification of the results. Before the proposal was placed on the ballot for the voters' consideration, the Appellants sought a declaration of its constitutionality. In view of "the premise that `all political power is inherent in the people and that we must, if possible, interpret the amendment as constitutional,'" Citizens For Responsible Growth v. City of St. Pete Beach, 940 So.2d 1144, 1146 (Fla. 2d DCA 2006) (quoting Charlotte County Board of County Comm'rs v. Taylor, 650 So.2d 146, 148 (Fla. 2d DCA 1995)), the issue presented to the trial court was very simply whether any part of the proposed amendment was constitutional. If any portion of the amendment was constitutional, the trial court was correct in allowing the entire amendment to be placed on the ballot. See id.
Our consideration of the issue is limited to whether the challenged petitions, individually, contravene the Florida Constitution as inconsistent with state law. When a petition can "have a valid field of operation even though segments of the proposal or its subsequent applicability to particular situations might result in contravening the organic law," it must be submitted to the electorate. Dade County v. Dade County League of Municipalities, 104 So.2d 512, 515 (Fla. 1958). Only when a petition is unconstitutional in its entirety may it be precluded from placement on the ballot.
Id. at 1146-47. Given these parameters, I would affirm the trial court's determination that the amendment was constitutional and should have been placed on the ballot.
*655 Although the legislature has passed extensive and inclusive laws regarding the governance of elections, it has not chosen to prescribe the type of voting machine that is to be used throughout the State of Florida. See § 101.5604, Fla. Stat. (2006) ("The board of county commissioners . . . may . . . provide for the use of any electronic or electromechanical voting system approved by the Department of State. . . ." (emphasis added)). Although I wholeheartedly agree with the majority that there is a need for uniformity in this area-as has been demonstrated by recent national elections  the fact that the legislature has chosen to allow the county commissioners of each individual county to choose what type of machine will be used in that particular county indicates that the legislature has chosen not to preempt this area specifically or impliedly.
Although the legislature has adopted certain requirements that limit the choices available to county commissions, see § 101.5606, the restrictions that the SAFE amendment would place on the Sarasota County Commission in choosing the type of voting machine to be used in Sarasota County are not inconsistent with these legislatively enacted requirements. In other words, the list of minimum requirements for voting machines enumerated by the legislature would simply be expanded by the additional standards that the amendment would impose. The Sarasota County Commission could follow the additional standards and still be consistent with the statutory requirements contained in section 101.5606. As such, these additional standards are not inconsistent with state law; rather, they add to state law. See Citizens for Responsible Growth, 940 So.2d at 1150 ("Rather than conflicting with the statutory framework, the proposed City charter amendments complement it. . . ."). Because the legislature has chosen not to preempt this area of election law and because the amendment does not contradict state law regarding the selection of voting machines, I would conclude that the amendment provision dealing with the choice of voting machines is not unconstitutional. Based on this conclusion alone, I would affirm the trial court's decision to allow the amendment to be placed on the ballot.
However, I also disagree with the majority's conclusion that the audit provisions are inconsistent with Florida's existing election code. First, I reject the Appellants' argument that the audit provisions are in essence recount provisions. To the contrary, the amendment provisions are truly audit provisions that are to be implemented to assure the accuracy of the electronic voting machines, not to affirm the certification of the winner of a race. The amendment requires that all votes in selected precincts be hand-counted as a type of spot check sampling to determine the accuracy of the electronic voting machines. By contrast, in a true recount, all of the votes in all of the precincts in a county in a particular race are recounted to assure that the count is accurate for that race alone. Accordingly, I conclude that the amendment's audit provision is a true audit requirement, not a recount provision.
Audit provisions have not been specifically preempted by the legislature. Section 101.591(1) provides that "[t]he Legislature, upon specific appropriation and directive, may provide for an independent audit of the voting system in any county." However, since the legislature has chosen not to provide for audits and has not prohibited local officials from doing so, I do not consider this to be an implied preemption of the audit issue. See Phantom of Clearwater, Inc. v. Pinellas County, 894 So.2d 1011, 1019 (Fla. 2d DCA 2005) ("Accordingly, courts imply preemption only when the legislative *656 scheme is so pervasive as to evidence an intent to preempt the particular area, and where strong public policy reasons exist for finding such an area to be preempted by the Legislature." (emphasis added) (internal quotation marks omitted)).
In the instant case, the audit provisions proposed by SAFE are to be applied in addition to, and are not inconsistent with, the election statutes implemented by the Florida Legislature. Accordingly, I would not find them to be unconstitutional. See Bennett M. Lifter, Inc. v. Metro. Dade County, 482 So.2d 479, 483 (Fla. 3d DCA 1986) ("Legislative provisions are inconsistent if, in order to comply with one provision, a violation of the other is required. . . . [T]he sole test of conflict for purposes of preemption is the impossibility of co-existence of the two laws."). The fact that the people of Sarasota County would ask their officials to take additional steps to ensure the accuracy of the voting results  steps that may not be required by other counties  does not, in my opinion, render them inconsistent with state law.[16]See id. Because the legislature has not preempted the audit issue specifically or impliedly and because the amendment provisions are not inconsistent with state law, I would conclude that the audit provisions  like the voting machine provision  are not unconstitutional. Accordingly, having determined that, at the very least, these two portions of the SAFE amendment were constitutional, the trial judge was correct to place the entire amendment on the ballot. See Citizens for Responsible Growth, 940 So.2d at 1146-47.
Finally, I would acknowledge that certain minor provisions of the amendment might be in conflict with specific provisions of the election code.[17] However, these specific issues do not render the amendment as a whole unconstitutional. See id. Accordingly, I would affirm the trial court's decision to allow the charter amendment proposed by SAFE to appear on the ballot.
NOTES
[1] On August 30, 2006, the Board filed an amended complaint adding Florida's Secretary of State and Sarasota County's Supervisor of Elections as defendants in the action because these officials had an interest in the outcome of the case.
[2] In light of the legal issues presented to the trial court  preemption and conflict with state law  the purpose of the evidentiary hearing is unclear. It appears that the trial court sought to fulfill its perceived duty to determine whether at least a portion of the amendment could survive a constitutional attack. At the evidentiary hearing, the parties presented the testimony of two supervisors of elections who held diametrically opposed views concerning the feasibility of implementing the proposed amendment and their understanding of the proposed amendment.
[3] The final judgment also stated that "[t]he sole issue for the [trial] court's determination in this case [was] whether the proposed amendment [was] unconstitutional in its entirety." The trial court was correct in noting that it could issue an injunction against submission of the proposed amendment to the electorate only if it found the amendment unconstitutional in its entirety. See Dade County v. Dade County League of Municipalities, 104 So.2d 512, 515-16 (Fla.1958). Having concluded that not every part of the proposed amendment was unconstitutional, the trial court ordered submission to the electorate. We need not address the issue of the severability of portions of the proposed amendment because that issue was rendered moot when the proposed amendment was presented to the electorate. We will address, however, the trial court's erroneous analysis and conclusions regarding preemption and conflict.
[4] In November 2006, the Sarasota electorate approved the proposed amendment.
[5] At oral argument, SAFE indicated that it did not seek an advisory opinion from the Division of Elections concerning the proposed charter amendment prior to seeking that the amendment be placed on the ballot.
[6] See, e.g., §§ 101.001 (conferring upon local governments the authority to alter and create voting precincts and designate polling places), 101.293-.295 (conferring upon local governments the authority to select a voting system among those systems approved by the Division of Elections), 102.012 (conferring upon supervisors of election the authority to appoint local election boards). The duties conferred upon local governments essentially relate to administrative or budgetary concerns, not substantive voting procedures or policy concerns regarding uniformity.
[7] "Field preemption" is a term that is used in federal case law, but it is a counterpart to our implied preemption analysis.
[8] While this appeal was pending, pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(B)(i), this court certified this matter to the Florida Supreme Court as one presenting an issue of great public importance and involving circumstances which required that the Florida Supreme Court immediately resolve the issue. The supreme court declined to accept jurisdiction and remanded the case to this court for further proceedings. See Cobb v. Sarasota Alliance for Fair Elections, 942 So.2d 412 (Fla.2006) (table decision).
[9] This fact further supports our finding that the Election Code has preempted the field as to the voting systems to be used in Florida because the legislature has spoken on the exact issue which the SAFE amendment sought to legislate. See McKenzie Check Advance of Fla., LLC. v. Betts, 928 So.2d 1204, 1210 (Fla.2006) (noting that courts may consider later amendments to statutes in determining legislative intent); State, Dep't of Bus. & Prof'l Regulation v. WJA Realty Ltd. P'ship, 679 So.2d 302, 306 (Fla. 3d DCA 1996) (approving trial court's consideration of subsequent amendment to the statute at issue "as a clarification of the legislature's original intent").
[10] This fact further supports our finding that the Election Code has preempted the field as to the subject of mandatory audits because the legislature has dictated when voting system audits are required. The legislature has also expressly granted the Department of State authority to enact rules regulating the conduct of such audits. See ch.2007-30, § 9, at 8, Laws of Fla. (2007) ("Effective upon this act becoming a law, the Department of State shall adopt rules to implement the provisions of s. 101.591, Florida Statutes, as amended by section 8 which prescribe detailed audit procedures for each voting system, which shall be uniform to the extent practicable, along with the standard form for audit reports.").
[11] The May 2007 amendments changed this provision of the Election Code. Under section 101.048(1), Florida Statutes (2007), a person casting a provisional ballot has until 5 p.m. on the second day following election to support his or her eligibility to vote.
[12] The May 2007 amendments to the Election Code moved these provisions to section 102.141(7) of the statute.
[13] The May 2007 amendments to the Election Code changed this time frame to twelve days after a general election. § 102.112(2), Fla. Stat. (2007).
[14] Even the trial court expressed concern about the constitutionality of this provision, stating: "Section 6.2C . . . prohibiting certification of elections prior to completion of the mandatory audits . . . does appear to be in conflict with the provisions of Section 102.141, Florida Statutes. Furthermore, the opening sentence of Section 6.2C is vague at best when extending the prohibition against certification to some point in time when `any cause for concern about accuracy of results has been resolved.'" We also note that on its face, this vague language invites arbitrary interpretation.
[15] In light of our holding, we do not address Secretary Browning and Supervisor Dent's argument that the SAFE amendment is impermissibly vague. The issue of vagueness would not be subject to further appellate review because, as acknowledged by the parties at oral argument, it relates to individual "as applied" challenges to the amendment, which were not fully developed below.
[16] Although the majority questions whether the hearing before the trial court was really an evidentiary hearing, it is interesting to note that the Supervisor of Elections for Leon County testified at that hearing on behalf of the Appellants and told the trial court that his office had imposed certain audit procedures to assure electronic vote count accuracy.
[17] For example, the election code limits the handling of ballots to employees of the office of the supervisor of elections, or the canvassing board, § 101.572, while the amendment requires that audits be performed by an independent auditing firm.