QUINCE, C.J.
This case is before the Court for review of the decision of the Second District Court of Appeal in Browning v. Sarasota Alliance for Fair Elections, Inc., 968 So.2d 637 (Fla.2d DCA 2007). In its decision the district court ruled upon the following question, which the court certified to be of great public importance:
IS THE LEGISLATIVE SCHEME OF THE FLORIDA ELECTION CODE SUFFICIENTLY PERVASIVE, AND ARE THE PUBLIC POLICY REASONS SUFFICIENTLY STRONG, TO FIND THAT THE FIELD OF ELECTIONS LAW HAS BEEN PREEMPTED, PRECLUDING LOCAL LAWS REGARDING THE COUNTING, RECOUNTING, AUDITING, CANVASSING, AND CERTIFICATION OF VOTES?
Id. at 654. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
For the reasons set forth below, we conclude that the Florida Election Code does not preempt the field of elections law and answer the certified question in the negative. As explained below, we quash that portion of the Second District’s decision that finds preemption, but approve *884 the court’s conclusion that portions of the proposed amendment conflict with the Election Code.
FACTS AND PROCEDURAL HISTORY
The Sarasota Alliance for Fair Elections (SAFE), a political action committee, sponsored an amendment to the Sarasota County charter. SAFE gathered 12,060 certified signatures of Sarasota County voters on petitions calling for a referendum on the proposed amendment. The amendment set forth detailed election requirements to be implemented in Sarasota County effective January 1, 2008. The proposed amendment provides:
Section 6.2A. Voter Verified Paper Ballot.
(1) No voting system shall be used in Sarasota County that does not provide a voter verified paper ballot. The voter verified paper ballots shall be the true and correct record of the votes cast and shall be the official record for purposes of any audit conducted with respect to any election in which the voting system is used. While votes may be tallied electronically, subject to audit, no electronic record shall be deemed a ballot.
(2) Any electronic voting machine shall allow the voter to correct his or her ballot by rejecting overvoted ballots at the time of voting, when voting in person at the polling place.
6.2B. Mandatory Audits. In addition to Voting System Audits allowed in F.S. 101.591, the Sarasota County Supervisor of Elections shall provide for mandatory, independent, random audits of the voting system in Sarasota County. These audits shall consist of publicly observable hand counts of the voter verified paper ballots in comparison to the machine counts. The audits shall be conducted on Election Day or within 24 hours after the closing of the polls, in clear public view, by a reputable, independent and nonpartisan auditing firm. These audits shall be conducted for a minimum of 5% of Sarasota County precincts, for 100% of the ballot issues in the selected precincts; and for a minimum of 5% of the total ballots cast in Early Voting periods, 5% of the total Absentee ballots, and 100% of any precinct where there are highly unusual results or events. In addition, audits of 5% of Provisional ballots shall be completed by the 3rd day following the election, and audits of 5% of Military and Overseas (UOCAVA) ballots shall be completed within 24 hours of a primary election and within 10 days following a general election. The random selection of precincts to be audited shall be made in a physical, non-electronic, public drawing at the Supervisor of Elections Office only AFTER machine tallies from the precincts have been made public. This public drawing shall be made on an entirely random basis using a uniform distribution in which all precincts in the County have an equal chance of being selected. If machine counts are unavailable for any reason, the voter verified paper ballots shall be counted by hand by the independent auditors and recorded as the vote count for that precinct. Immediately upon completion of the audit, the persons conducting the audit shall furnish a copy of an audit to the Supervisor of Elections and the Board of County Commissioners and post the results for public view and copying at the Supervisor of Elections Office. The audit shall be considered a Florida public record pursuant to Florida Statute 119.
6.2C. Certification of Election Results. No election shall be certified until the mandatory audits are complete and any cause for concern about accura *885 cy of results has been resolved. Any discrepancies between machine counts and hand counts greater than 1% or, if less than 1% but sufficient to change the outcome of any measure, shall initiate a comprehensive manual audit of the voter verified paper ballots in all precincts and of all Absentee, Provisional, and Military and Overseas (UOCAVA) ballots. Such comprehensive manual audit shall be completed within 5 days after the election, with the exception of comprehensive audits of Military and Overseas ballots, which shall be completed within 5 days after a primary election, and within 10 days after a general election. Audits shall be completed by a reputable, independent and non-partisan auditing firm as in 6.2B above. A copy of these audits shall be retained for public view and copying at the Supervisor of Elections Office in addition to being given the County Commissioners. These audits shall be considered Florida public records pursuant to Florida Statute 119.
In August 2006, the Board of County Commissioners of Sarasota County filed a complaint in circuit court seeking a declaration of the constitutionality of the proposed amendment. The complaint named SAFE and Sarasota Supervisor of Elections Kathy Dent as defendants. The Board was concerned that the amendment was preempted by the state election laws or was in conflict with those laws. In turn, SAFE filed a petition for an emergency writ of mandamus, seeking an order compelling the Board and Supervisor Dent to include the amendment on the November 2006 election ballot. The two cases were consolidated based on the Board’s motion. The Board subsequently amended its complaint to include Florida Secretary of State Kurt Browning as a defendant.
Following an evidentiary hearing on the matter, the circuit court found that the proposed amendment was neither preempted by nor in conflict with Florida law. Thus, the circuit court concluded that the amendment was not unconstitutional in its entirety and ordered that it be submit-, ted to the electorate. The Board did not seek a stay of the circuit court’s final judgment. The amendment was placed on the November 2006 ballot and approved by a majority of the Sarasota County electorate. Secretary Browning and Supervisor Dent joined the Board in appealing the final judgment to the Second District Court of Appeal.
On appeal, a majority of the Second District panel found that the Florida Election Code impliedly preempted the charter amendment in its entirety and that the provisions of the charter amendment also directly conflicted with the Florida Election Code. Thus, the majority of the district court found the charter amendment to be unconstitutional. The district court also certified the question quoted above as being of great public importance and this Court granted review on this basis.
ISSUES AND ANALYSIS
This case presents several issues, including whether the proposed amendment is preempted by the Florida Election Code, whether the amendment conflicts with the Florida Election Code, and, if so, whether any conflicting provisions are severable from the amendment. We discuss each issue in turn below.
Under the Florida Constitution, counties operating under county charters, such as Sarasota County, “shall have all powers of local self-government not inconsistent with general law.” Art. VIII, § 1(g), Fla. Const. Further, the governing body of a charter county “may enact county ordinances not inconsistent with general law.” Id, There are “two separate and distinct ways” in which a local govern *886 ment enactment may be inconsistent with state law. Lowe v. Broward County, 766 So.2d 1199, 1206 (Fla. 4th DCA 2000) (quoting Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Tallahassee Med. Ctr., Inc., 681 So.2d 826, 831 (Fla. 1st DCA 1996)). A local government enactment may be inconsistent with state law if (1) the Legislature “has preempted a particular subject area” or (2) the local enactment conflicts with a state statute. Id. at 1206-07.
Preemption
Florida law recognizes two types of preemption: express and implied. Express preemption requires a specific legislative statement; it cannot be implied or inferred. See City of Hollywood, v. Mulligan, 934 So.2d 1238, 1243 (Fla.2006); Phantom of Clearwater, Inc. v. Pinellas County, 894 So.2d 1011, 1018 (Fla. 2d DCA 2005), approved, in Phantom of Brevard, Inc. v. Brevard County, 3 So.3d 309 (Fla. 2008). Express preemption of a field by the Legislature must be accomplished by clear language stating that intent. Mulligan, 934 So.2d at 1243. In cases where the Legislature expressly or specifically preempts an area, there is no problem with ascertaining what the Legislature intended. Tallahassee Mem'l, 681 So.2d at 831.
Florida’s Election Code is contained in Title IX of the Florida Statutes. While the Election Code is extensive, encompassing chapters 97 through 106 and 125 pages of the Florida Statutes, it contains no express language of preemption. Thus, we agree with the Second District that express preemption does not apply in this case. However, “preemption need not be explicit so long as it is clear that the legislature has clearly preempted local regulation of the subject.” Barragan v. City of Miami, 545 So.2d 252, 254 (Fla. 1989). Moreover, courts are “careful in imputing an intent on behalf of the Legislature to preclude a local elected governing body from exercising its home rule powers.” Tallahassee Mem'l, 681 So.2d at 831.
Preemption is implied “when ‘the legislative scheme is so pervasive as to evidence an intent to preempt the particular area, and where strong public policy reasons exist for finding such an area to be preempted by the Legislature.’” Phantom, 894 So.2d at 1018 (quoting Tallahassee Mem’l, 681 So.2d at 831). Implied preemption is found where the state legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with that pervasive regulatory scheme. Tribune Co. v. Cannella, 458 So.2d 1075, 1077 (Fla.1984) (finding that the legislative scheme of the Public Records Act preempted the law relating to production of records for inspection). In determining if implied preemption applies, the court must look “to the provisions of the whole law, and to its object and policy.” State v. Harden, 938 So.2d 480, 486 (Fla.2006) (quoting Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). The nature of the power exerted by the Legislature, the object sought to be attained by the statute at issue, and the character of the obligations imposed by the statute are all vital to this determination. Id.
The Second District concluded that the Election Code establishes “a detailed and comprehensive statutory scheme for the regulation of elections in Florida, thereby evidencing the legislature’s intent to preempt the field of elections law, except in those limited circumstances where the legislature has granted specific authority to local governments.” Browning, 968 So.2d at 646. While we agree that Florida’s Election Code is a detailed and extensive statutory scheme, we conclude that *887 the Legislature’s grant of power to local authorities in regard to many aspects of the election process does not evince an intent to preempt the field of election laws. For example, chapter 101, which governs voting methods and procedures, gives the boards of county commissioners authority to create or change the voting precincts and to designate the polling places. See §§ 101.001, 101.002, Fla. Stat. (2006). The supervisors of elections of each county are authorized to draft written procedures to ensure the accuracy and security of elections, which are subject to review by the Department of State. See § 101.015(4)(b)-(c), Fla. Stat. (2006). The board of county commissioners, in consultation with the supervisor of elections, also has the authority to adopt an electronic voting system from those that have been approved by the Department of State. See §§ 101.293, 101.5604, Fla. Stat. (2006). Chapter 102, which contains procedures for conducting elections and ascertaining election results, also gives the supervisors of elections authority to appoint an election board of clerks and inspectors to conduct the elections at each precinct, to recruit poll workers, and to conduct training of the poll workers. See §§ 102.012, 102.014, Fla. Stat. (2006).
In analogous cases, Florida courts have not found an implied preemption of local ordinances which address local issues. As even the Second District explained in the instant case, “[i]t generally serves no useful public policy to prohibit local government from deciding local issues.” Browning, 968 So.2d at 646. For example, in Phantom of Cleanwater, Inc. v. Pinellas County, the Second District concluded that a local ordinance regulating businesses that sold fireworks was not preempted by state statutes regulating both the sale and use of fireworks. 894 So.2d at 1020. The district court concluded that the fireworks statutes were not “so pervasive as to the field of the sale of fireworks” as to deprive local governments “of all local power in this regard.” Id. The court noted that the fireworks statutes addressed three topics: defining the term fireworks; requiring the registration of entities manufacturing or selling fireworks; and generally prohibiting the use or sale of fireworks with specified exceptions. The court determined that this did not constitute a “pervasive scheme of regulation.” Further, it found “no strong public policy reason that would prevent a local government from enacting ordinances in this area so long as they do not directly conflict” with the statutes. Id. In addition, the court noted, the statutes expressly delegated enforcement to local government, contemplated that counties would regulate outdoor displays of fireworks, and authorized the county boards to set and require surety bonds for people licensed by counties in connection with fireworks. “It is difficult for a court to imply preemption of the entire field of ‘sale of fireworks’ when the legislature affirmatively informs local government to act” in this area. Id. at 1019.
Similarly, in GLA & Assocs. v. City of Boca Raton, the Fourth District Court of Appeal found that a statute regulating state permits for dune rehabilitation projects did not preempt a local ordinance regulating coastal construction permits. 855 So.2d 278 (Fla. 4th DCA 2003). The court cited a statutory provision specifically requiring the Department of Environmental Protection to give deference to local setback requirements or building codes that were equal to or more strict than the state standards. Id. at 282. Thus, the statutory scheme specifically recognized that the need to control sand dune rehabilitation efforts may be greater in some counties than in others.
In the instant case, the Legislature clearly did not deprive local governments *888 of all local power in regard to elections. To the contrary, the Election Code specifically delegates certain responsibilities and powers to local authorities, including the choice of voting systems to be used in each locality as long as the system has been approved by the Department of State. This statutory scheme undoubtedly recognizes that local governments are in the best position to make some decisions for their localities. In light of this, we conclude that the Election Code does not impliedly preempt the field of elections law.
Conflict
As an alternative to the preemption issue, the Second District also concluded that the SAFE amendment conflicts with the Election Code. Browning, 968 So.2d at 649-653. The test of conflict between a local government enactment and state law is “whether one must violate one provision in order to comply with the other. Putting it another way, a conflict exists when two legislative enactments ‘cannot co-exist.’ ” Laborers' Int'l Union of N. Am., Local 478 v. Burroughs, 541 So.2d 1160, 1161 (Fla.1989) (quoting Laborers’ Int'l Union of N. Am., Local 478 v. Burroughs, 522 So.2d 852, 856 (Fla. 3d DCA 1987)) (citation omitted). The Second District reviewed each section of the SAFE amendment, finding conflict with a number of provisions of the Election Code. Browning, 968 So.2d at 649. In our analysis of the conflict issue, we consider each section of the amendment in turn and compare it to the provisions of the Election Code.
Section 6.2A of the amendment provides that no voting system can be used in Sarasota County elections that does not provide a voter verified paper ballot. It also provides that the voter verified paper ballots shall be the official record of the votes cast and while votes may be tallied electronically the electronic record is not deemed a ballot. When the SAFE amendment was promulgated, touch-screen voting machines without a paper record were one of the voting systems that had been approved by the Department of State and were thus one of the systems that counties were authorized to choose. The SAFE amendment was intended to prohibit the use of touch-screen machines in Sarasota elections.
As Judge Davis explained in his dissenting opinion below, the Legislature adopted certain requirements that limit the choices of voting systems that are available to county commissions. Browning, 968 So.2d at 655 (Davis, J., dissenting); see also § 101.5606, Fla. Stat. (2006) (specifying that the Department of State shall not approve an electronic or electromechanical voting system unless it meets certain enumerated requirements). These minimum requirements for voting machines that have been enumerated by the Legislature are simply “expanded by the additional standards that the [SAFE] amendment would impose.” Browning, 968 So.2d at 655 (Davis, J., dissenting). Thus, the Sarasota County Commission could follow the additional standards of section 6.2A of the amendment without being in conflict with the minimum statutory requirements established by the Legislature. See Citizens for Responsible Growth v. City of St. Pete Beach, 940 So.2d 1144, 1150 (Fla. 2d DCA 2006) (“Rather than conflicting with the statutory framework, the proposed City charter amendments complement it....”).
Accordingly, we find no conflict between section 6.2A of the SAFE Amendment and the Florida Election Code. However, even if there were a conflict, the issue would be moot. The Legislature has subsequently amended the Election Code effective July 1, 2008, to provide that all voting in Florida (with the exception of persons with disabilities) must be “by marksense ballot utilizing a marking de *889 vice for the purpose of designating ballot selections.” § 101.56075(1), Fla. Stat. (2007); see also ch. 2007-30, § 6, at 326-27, Laws of Fla. Thus, touch-screen voting machines will no longer be permitted in Florida. The Legislature has spoken on the exact issue on which the SAFE amendment sought to legislate and thereby rendered any potential conflict moot.
Section 6.2B of the amendment requires “mandatory, independent, and random audits” of the Sarasota voting system. These audits must be “publicly observable hand counts of the voter verified paper ballots in comparison to the machine counts.” Under the 2006 Election Code, the Legislature had the authority to determine whether to order an independent audit of a county’s voting system. § 101.591(1), Fla. Stat. (2006).[1] The statute did not establish any procedures for such audits nor preclude a county from conducting its own audit of its voting system. Thus, at the time when the trial court and the district court considered the constitutionality of the amendment, there was no direct conflict with any audit provisions in the state Election Code.
Section 6.2C of the amendment provides that no election can be certified until the mandatory audits in section 6.2B are completed and any accuracy concerns have been resolved. This section also provides that if there is a discrepancy of one percent or more between the machine counts and the hand counts (or less than one percent if it is sufficient to change the outcome of any measure) there must be a comprehensive manual audit of all voter verified paper ballots in all precincts and all absentee, provisional, and military and overseas ballots. This comprehensive “audit” must be completed within five days of a primary election and ten days of a general election. The “audit” is to be conducted by an independent, nonpartisan auditing firm.
While the SAFE amendment calls the discrepancy-triggered procedure in section 6.2C an audit, it is actually a manual recount. All of the ballots are subject to a “manual audit” when there is a discrepancy of one percent or more between the machine counts and the “hand counts” of ballots conducted under the section 6.2B random audits. Moreover, the election result cannot be certified until these “audits” of all ballots in that particular race are completed and “any cause for concern about the accuracy of the results has been resolved.”
We conclude that the procedure set forth in section 6.2C conflicts with the statutory provisions in the Election Code in several ways. First, the Election Code specifies that the county canvassing board must certify the election results. §§ 102.071, 102.112, 102.151, Fla. Stat. (2006). In contrast, the SAFE amend *890 ment provides for an independent auditing firm to complete the required audits before the election results may be certified. Second, the Election Code requires election results to be certified by 5 p.m. on the seventh day after a primary election and by 5 p.m. on the eleventh day following a general election. § 102.112(2), Fla. Stat. (2006). If the returns are not received by the Department of State by the time specified, “such returns shall be ignored and the results on file at that time shall be certified by the department.” Id. § 102.112(8). The SAFE amendment provides that no election results can be certified until the independent auditing firm completes its mandatory audits and “any cause for concern about accuracy of the results has been resolved,” without a date certain being specified. Third, the Election Code provides for the county canvassing board to conduct a recount of the votes cast when the election margin is one-half of a percent or less. However, the losing candidate has the option of requesting in writing that the recount not be conducted. § 102.141(6), Fla. Stat. (2006). Section 102.141(6)(a)-(c) also specifies how recounts are to be conducted and the votes tabulated. The statute requires the Department of State to “adopt detailed rules prescribing additional recount procedures for each certified voting system, which shall be uniform to the extent practicable.” Id. § 102.141(6)(d). Pursuant to this authority, the Division of Elections has promulgated a number of regulations that provide detailed procedures for conducting recounts and for ascertaining voter intent. See Fla. Admin. Code R. 1S-2.027, 1S-2.031. In contrast, the SAFE amendment requires a complete recount if the discrepancy between machine counts and the hand counts are greater than one percent or less than one percent if it can change the outcome of the race. These hand counts are to be conducted by an independent auditing firm, but there are no procedures specified for how the hand counts are to be conducted. Nor would an independent auditing firm be subject to the administrative rules enacted by the Division of Elections. Thus, two separate entities could be handling the ballots during the same time period and employing different methods in ascertaining the results to be certified if the SAFE amendment is put into operation.[2] Most notably, the Election Code provides that “no vote shall be received or counted in any election, except as prescribed by this code.” § 101.041, Fla. Stat. (2006). Section 6.2C clearly conflicts with this directive.
In light of these conflicts, we conclude that section 6.2C of the SAFE amendment “does not parallel or complement the Election Code, but rather conflicts with it.” Browning, 968 So.2d at 653. “[C]oncurrent legislation by [local *891 government] may not conflict with state law. If conflict arises, state law prevails.” Citizens for Responsible Growth v. City of St. Pete Beach, 940 So.2d 1144, 1147 (Fla. 2 DCA 2006) (quoting W. Palm Beach Ass’n of Firefighters v. Bd. of City Comm'rs, 448 So.2d 1212, 1215 (Fla. 4th DCA 1984)). Thus, section 6.2C of the amendment is unconstitutional.
Severability
Finally, we must determine whether the unconstitutionality of section 6.2C requires that the whole SAFE amendment be struck down or whether this provision may be severed fi-om the amendment. SAFE correctly notes that section 8.4 of the Sarasota County charter provides that if any part of the charter is held to be invalid or unconstitutional it does not impair the validity of any other part. However, the severability clause further provides that the invalidated provision is not severable if “it clearly appears that such other article or part thereof ... is wholly or necessarily dependent for its operation upon the article or article or part thereof ... held to be invalid or unconstitutional.” Sarasota County, Fla., County Charter, Art. VIII, § 8.5 (2000). Thus, the determinative question is whether the other two sections of the SAFE amendment are necessarily dependent for their operation upon section 6.2C. We conclude that they are not. Section 6.2A merely specifies that the voting system used in Sarasota County must provide a verified paper ballot and allow a voter to correct his or her ballot by rejecting overvoted ballots at the time of voting. Section 6.2B provides for mandatory audits of the voting system. These provisions are completely operational without the certification requirements in section 6.2C. Thus, we conclude that section 6.2C can and should be severed from the rest of the amendment.
CONCLUSION
For the reasons discussed above, we approve in part and quash in part the Second District’s decision in his case. We also answer the certified question in the negative.
It is so ordered.
PARIENTE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in part and dissents in part with an opinion.
POLSTON, J., concurs in part and dissents in part with an opinion.
CANADY, J., recused.

. We note that this statute was subsequently amended by the Legislature to require county canvassing boards to conduct a manual audit of the voting systems used in randomly selected precincts. The statute requires the audit to take place immediately following the certification of each election, sets forth the procedures to be used in the audit, establishes a timeline for completion of the audit, and specifies the information to be included in the report that must be submitted to the Department of State. See § 101.591, Fla. Stat. (2008). Further, the Legislature gave the Department of State authority to adopt rules relating to this audit procedure. See § 101.5911, Fla. Stat. (2008). These statutes took effect on July 1, 2008. See ch. 2007-30, § 8, at 327-28, Laws of Fla. To the extent that section 6.2B of the SAFE amendment conflicts with these provisions, the state statutes would prevail. See Citizens for Responsible Growth v. City of St. Pete Beach, 940 So.2d 1144, 1147 (Fla. 2 DCA 2006) ("Concurrent legislation by [local government] may not conflict with state law. If conflict arises, state law prevails.”).

. Section 101.572, Florida Statutes (2006), which authorizes public inspection of the official ballots, also provides that "no persons other than the supervisor of elections or his or her employees or the county canvassing board shall handle any official ballot or ballot card.” The Second District cited this statute as evidence of the conflict between the SAFE amendment and the Election Code because individuals not authorized by statute to handle the ballots are required to conduct the audits for the certification of the election results under the amendment. At oral argument, the attorney representing SAFE argued that the independent auditing firm could conduct the audits without touching the ballots. SAFE asserted that the supervisor of elections or his or her employees or the county canvassing board would be responsible for handling the ballots during the audits, as provided in section 101.572 when a public inspection of ballots is requested. While this procedure would resolve any conflict between the Election Code and the SAFE amendment regarding the handling of the ballots, it does nothing to resolve the other conflicts regarding the certification of election results.