SCHWARTZ, Senior Judge.
 

 Charles E. White appeals his convictions for two counts of first-degree murder (Count 1 and 2), burglary with an assault or battery while armed (Count 3), robbery while armed with a firearm or deadly weapon (Count 4), two counts of kidnapping with a weapon (Count 5 and 6), use or display of a firearm in the commission of a felony (Count 7), and possession of a short-barreled rifle (Count 8). White says a number of issues mandate reversal. On the following analysis, we affirm.
 
 [1]
 
 ,
 
 [2]
 

 On February 22,1999, police were called to the home of Leonard Mayers. In the northeast bedroom of the home, police found the bodies of Mayers and Leon Gray. The home’s back door and door jamb were damaged. A pickax was found on the ground near the back stoop, a sawed off shotgun in a neighboring yard, and a black bandana in another backyard.
 
 [3]
 
 The victims each died of close range gunshot wounds, their wrists and portions of their heads bound with duct tape. Mayers was a drug dealer and narcotics and drug-related paraphernalia were found in the home. On the walls inside one of the
 
 *337
 
 bathrooms was written “I want wartime, next time someone will die.”
 

 On December 29, 1999, investigating the double homicide, and following a lead from a fellow officer, Detectives Chris Stroze and Steven Paar went to White’s home. White gave a detailed, innocent account of his actions some ten months earlier. This story of his activities did not include anything involving his friend Armond Davis (later to be his co-defendant) or going to Leonard Mayers’ house. To the contrary, White said that he had never been to Mayers’ home and had never worked for him. Stroze asked White if he would be willing to take a polygraph test, but White refused saying that the test proved nothing. Stroze then recounted to White certain information told to him by Davis, to which White gave the incongruous response, “You mean the person I was in the house with was a killer?” Stroze ended the forty-five-minute interview at that point, but did not arrest White.
 

 The next day, after receiving an additional lead pointing to White’s involvement in the crimes, Stroze put a notification into police computers asking that he be alerted if any officer came into contact with White. A year later, on December 30, 2000, at 2:00 p.m., White was arrested for possession of marijuana.
 
 [4]
 
 Rather than take him to the magistrate for a plea or bond disposition as would have been the usual course after a marijuana arrest, the officers took White to Stroze for questioning on the crimes at issue here, for which, it was admitted, there was then no probable cause to arrest. Toward the end of some thirteen hours of questioning on that subject, however, White finally admitted his participation in the crimes for which he was subsequently charged and convicted. An account of the twenty-four hours following the arrest reveals the following:
 

 Saturday, December 30, 2000:
 

 2:00 p.m. White is arrested on the possession charge.
 

 2:05 p.m. Detective Stroze is called and informed of the arrest, Stroze asks that White be transported to the Homicide office immediately.
 

 White is held approximately five hours prior to transport.
 
 [5]
 

 6:55 p.m. White arrives at Stroze’s office, possibly after other detainees have been dropped off at TGK.
 
 [6]
 
 ’
 
 [7]
 

 
 *338
 
 7:05 p.m. until 9:00 p.m. White is questioned; he denies any involvement in the crimes.
 

 9:30 p.m. until 11:30 p.m. White is questioned; he denies any involvement in the crimes.
 

 Sunday, December 31, 2000:
 

 12 a.m. until 1:30 a.m. White is questioned; he denies any involvement in the crimes.
 

 2:30 until 7:50 am White is questioned; he admits his involvement in the crimes.
 

 7:56 a.m. until 8:39 a.m. White gives a formal recorded account of the crimes.
 

 11:07 a.m. The hired stenographer completes typing out White’s statement. White is shown the statement, he makes two corrections and signs it.
 

 12:30 p.m. (twenty-two and one-half hours after White’s initial arrest) White is taken to TGK (which Stroze estimates to be approximately three miles from the homicide offices.) (Computer records show that White pleaded guilty to the possession charge on January 1, 2001, at his first appearance hearing.)
 

 I
 

 White moved to suppress his statements. Among other arguments, he contended, as he does here, that because he was questioned for an extended period time rather than taken directly before a judicial officer, Florida Rule of Criminal Procedure 3.130 mandates suppression. The trial judge rejected this argument, as do we.
 

 Rule 3.130, provides:
 

 Except when previously released in a lawful manner, every arrested person shall be taken before a judicial officer, either in person or by electronic audiovisual device in the discretion of the court, within 24 hours of arrest.
 

 On numerous occasions, our courts have concluded that suppression was not required notwithstanding the fact that a defendant was not brought before a judicial officer within twenty-four hours of the arrest. Rather, “when a defendant has been advised of his rights and makes an otherwise voluntary statement, the delay in following the strictures of [Rule 3.130] must be shown to have induced the confession.”
 
 Globe v. State,
 
 877 So.2d 663, 671-72 (Fla.2004) (quoting
 
 Chavez v. State,
 
 832 So.2d 730, 752 (Fla.2002);
 
 Keen v. State,
 
 504 So.2d 396, 400 (Fla.1987), disapproved in part on other grounds by
 
 Owen v. State,
 
 596 So.2d 985, 990 (Fla.1992));
 
 Woods v. State,
 
 755 So.2d 810, 813 (Fla. 3d DCA 2000).
 

 As
 
 Conde v. State,
 
 860 So.2d 930, 951-53 (Fla.2003), instructs, any prejudice due to the delay “must be proven on a case-by-case basis.” See
 
 Globe,
 
 877 So.2d at 671-72 (same);
 
 Keen,
 
 504 So.2d at 400, disapproved in part on other grounds by
 
 Owen,
 
 596 So.2d at 990 (“[E]ach case must be examined upon its own facts to determine whether a violation of the rule has induced an otherwise voluntary confession.”). This approach is in keeping with the majority view nationwide. See
 
 Commonwealth v. Rosario,
 
 422 Mass. 48, 661 N.E.2d 71, 76 n. 4 (1996) (“Most States that have addressed the admissibility of a confession obtained during an unlawful prearraignment delay do not have a rule of automatic exclusion. See, e.g.,
 
 People v. Kendrick,
 
 56 Cal.2d 71, 85, 14 Cal.Rptr. 13, 363 P.2d 13 (1961);
 
 State v. Franklin,
 
 463 A.2d 749, 753 (Me.1983);
 
 People v. Cipriano,
 
 431 Mich. 315, 333-334, 429 N.W.2d 781 (1988);
 
 State v. Mendocino,
 
 288 Or. 231, 236, 603 P.2d 1376 (1979).”); see generally Romual-do P. Eclavea, Annotation, “Admissibility of confession or other statement made by
 
 *339
 
 defendant as affected by delay in arraignment-modern state cases,” 28 A.L.R.4th 1121 (1984 & Supp. 2011) (§ 5, identifying Florida and a number of other states as rejecting a per se rule, in favor of some form of a “[qualified view that delay does not render confession inadmissible unless delay induced or caused, or was used to extract confession”); but see
 
 id.
 
 (§ 3, identifying states holding “[b]road view that delay renders confession inadmissible per se”).
 
 [8]
 

 Acceptance of White’s position would, in effect, require the addition of language to Rule 3.130 to require that he should have been taken ‘directly’ or ‘without unnecessary delay’ to a magistrate, as required in a number of other states. However, that is not what Rule 3.130 provides and we are simply not at liberty to add language to the rule as written. See
 
 Browning v. Sarasota Alliance for Fair Elections, Inc.,
 
 968 So.2d 637, 651 (Fla. 2d DCA 2007) (“When the legislature has described the particular situation in which a set of procedures should apply, an inference must be drawn that what is not included by specific reference was intended to be excluded.”),
 
 [9]
 

 rev’d on other grounds,
 
 28 So.3d 880 (Fla.2010). Moreover, our Supreme Court has instructed that a showing of prejudice is a condition precedent to the strict enforcement of its procedural rules, again barring any per se rule for suppression. See
 
 Lachos v. State,
 
 339 So.2d 217, 219 (Fla.1976) (“We agree that a showing of prejudice should be a condition precedent to undertaking the kind of procedural niceties envisioned by [prior decisions strictly enforcing a procedural rule].”).
 

 As part of this analysis, it is appropriate to consider whether the claimed fact that White’s presentation to the magistrate was delayed for the quite obvious, perhaps improper purpose of obtaining information on unrelated crimes mandates a different result. Essentially because the resolution of these issues turns on whether the officers’ actions are objectively lawful and subjective motivations are irrelevant, we conclude that it does not.
 

 We know that in the context of “pretex-tual stop” cases, “the subjective knowledge, motivation, or intention of the individual officer involved [is] wholly irrelevant [to the determination of the legality of the stop].” Dep’t
 
 of Highway Safety & Motor Vehicles v. Jones,
 
 935 So.2d 532, 534 (Fla. 3d DCA 2006) (“The constitutional validity
 
 *340
 
 of a traffic stop depends on purely objective criteria.
 
 Whren v. United States,
 
 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); see also
 
 Department of Highway Safety and Motor Vehicles v. Utley,
 
 930 So.2d 698 (Fla. 1st DCA 2006) (Hawkes, J., concurring).”); see
 
 Holland v. State,
 
 696 So.2d 757, 759 (Fla.1997) (concluding that the objective test “asks only whether any probable cause for the stop existed”). This objective standard also has been applied to suppression questions where an arrest has been made for one crime, and the defendant claims that the motivation for the arrest was the investigation of entirely different crime.
 
 [10]
 
 ,
 
 [11]
 
 The same analysis applies here.
 

 It is true that a number of state cases have in fact concluded that a confession secured as the result of a delay should be suppressed.
 
 [12]
 
 In
 
 State v. Bennett,
 
 176 W.Va. 1, 339 S.E.2d 213, 218 (1985), the West Virginia court concluded that “officers acted improperly, under the circumstances, in failing to present the appellant to Magistrate Michael until after the officers obtained the appellant’s written confession ... the record indicates that the officers delayed presentment for the purpose of obtaining a separate confession,” and thus decided “[t]he circuit court committed error in admitting that confession into evidence.” Again, in
 
 State v. Persinger,
 
 169 W.Va. 121, 286 S.E.2d 261, 270 (1982), the court observed “the focus is not so much on the length of the detention but whether the police were primarily using the delay in bringing the defendant before a magistrate to obtain a confession from him.” However, West Virgina’s statute specifically requires the defendant be brought before the adjudicating authority “without unnecessary delay,” which would make the officers’ actions in these cases objectively against that state’s law. Here, the fact remains that Rule 3.130 did not require White be taken directly to the magistrate; accordingly, the reason for the stop at the homicide office did not need to be considered, and certainly standing alone, did not require suppression. It is
 
 what occurred during
 
 the delay that controls.
 
 [13]
 
 ,
 
 [14]
 

 State v. Wiberg,
 
 296 N.W.2d 388,
 

 
 *341
 
 393 (Minn.1980), persuasively states:
 
 [15]
 

 Application of the exclusionary rule exacts a great cost on societal interests by the proscription, in many cases, of con-cededly relevant and reliable evidence. Against this burden on societal interests, however, must be balanced the deterrence of improper police action that the exclusionary rule promotes. We feel that the balance is not' struck by the rigid exclusion of reliable evidence reasonably related to a violation of [that state’s presentment rule] in every case in which such a violation occurs. [Citations omitted].
 

 In sum, as observed in
 
 Keen,
 

 [16]
 

 a blanket rule mandating suppression is inappropriate. Here, the police acted within the law in bringing White to Stroze rather than directly to a judicial officer. White was held for some five hours awaiting transport and then questioned for some thirteen hours. Appropriate
 
 Miranda
 
 warnings were given.
 
 [17]
 
 As in
 
 Globe,
 
 White’s incriminating statement came within twenty-four hours of his arrest. White was given breaks, rest room visits and water; he never asked for questioning to stop and never asked for anything else; rather, the uncontroverted testimony was that had White requested anything, the officers would have complied with that request.
 
 [18]
 

 While White cites computer records showing a first appearance hearing on January 1, 2001, nothing was said at the suppression hearing as to the availability of a magistrate that holiday weekend.
 
 [19]
 
 ,
 
 [20]
 
 Thus, White did not carry the burden of demonstrating that the delay induced his statements. See
 
 Chavez,
 
 832 So.2d at 753
 
 *342
 
 (citing
 
 Keen
 
 and observing “[ajbsent a showing that the delay induced this otherwise voluntary statement, we find that the trial court properly denied Keen’s motion to suppress”);
 
 Romanello v. State,
 
 160 So.2d 529, 582-38 (Fla. 1st DCA 1964) (concluding that it was defendant’s obligation to demonstrate that the delay induced the confession and “it will not be presumed that such was the case”). Hence, we cannot say that the trial court abused its discretion in denying his motion to suppress.
 
 [21]
 
 ,
 
 [22]
 

 Globe,
 
 877 So.2d at 671-72;
 
 Blanco v. State,
 
 452 So.2d 520, 523 (Fla.1984) (“A trial judge’s ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion.”).
 

 For these reasons, White’s detailed account of the crimes committed, including, his admission to his prior robbery of May-ers’ home, his admission to having written on the mirror in Mayers’ home the threat “I want wartime, next time someone will die,” his admission to entering the home with co-defendant Davis for the purpose of stealing drugs and money, his possession of a shotgun in the home, his admitted confrontation with the two victims, and his claim that as he searched for drugs in another room he heard two shots and found Davis fleeing the residence with the shotgun and a duffle bag, were all properly admitted into evidence.
 

 II
 

 Largely on the basis of these admissions, in turn (as well as other record evidence), we find that White cannot prevail on either of the other two substantial issues raised.
 

 1. Postell Violation Not Reversible Error
 

 First, White complains that the prosecutor’s elicitation of evidence that the source of the investigative lead that caused the detectives to first question him was co-defendant Davis, constituted inferential hearsay that should not have been admitted.
 
 [23]
 
 See
 
 Postell v. State,
 
 398 So.2d 851,
 
 *343
 
 854 (Fla. 3d DCA 1981). We agree, but on the facts at hand, find the error was harmless.
 

 “An officer may say what he did pursuant to information but he may not relate the information itself for such is hearsay.” Collins
 
 v. State,
 
 65 So.2d 61, 67 (Fla.1953). Where “the inescapable inference from testimony [concerning a tip received by police] is that a non-testifying witness has furnished the police with evidence of the defendant’s guilt, the testimony is hearsay, and the defendant’s right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated.”
 
 Wilding v. State,
 
 674 So.2d 114, 119 (Fla.1996), receded from on other grounds,
 
 De-voney v. State,
 
 717 So.2d 501 (Fla.1998) (quoting
 
 Postell,
 
 398 So.2d at 854). Here, the evidence was all the more damaging as it identified as the source White’s co-defendant. Indeed the legal assumption that this fact is uncommonly prejudicial and therefore must be kept from the jury is the very reason that Davis was tried separately. See
 
 Smith v. State,
 
 699 So.2d 629, 643 (Fla.1997) (observing that severance rule provides trial court with discretion to grant severance and is designed to ensure fair determination of each defendant’s guilt or innocence by enabling presentation of evidence in such a manner that jury can distinguish evidence properly admitted against each defendant); see also
 
 Ramirez v. State,
 
 739 So.2d 568, 579 (Fla.1999) (explaining that it is error to admit the details of a non-testifying co-defendant’s confession and that a co-defendant’s statements “are especially suspect because he has a strong motive to implicate another”). Neither the facts that, as the State points out, White was not arrested until a year later nor that Stroze testified that police were then following a number of leads, change the conclusion that the testimony should not have been admitted.
 

 Nonetheless, considering the substantial evidence establishing White’s guilt, including his detailed admissions,
 
 [24]
 
 we conclude that the error was harmless under the test stated in
 
 Ventura v. State,
 
 29 So.3d 1086 (Fla.2010). See
 
 Zuluaga v. State,
 
 915 So.2d 1251, 1254 (Fla. 3d DCA 2005) (addressing a claimed violation of
 
 Postell,
 
 “[w]hether the out-of-court statement was improperly admitted on relevancy grounds or because it was hearsay is not dispositive as either way it was error subject to a harmless error analysis”);
 
 Hernandez v. State,
 
 547 So.2d 138, 138 (Fla. 3d DCA 1988) (“Given the vague nature of this testimony and the other evidence of guilt in this case, we are unwilling to upset this conviction on this and
 
 *344
 
 other technical errors.”);
 
 Barnes v. State,
 
 470 So.2d 851, 852 (Fla. 1st DCA 1985) (“Given the substantial evidence establishing Barnes’ guilt, and the brief and abbreviated nature of the challenged hearsay, we find that the officer’s references to the anonymous phone call were harmless error.”).
 
 [25]
 

 2. Polygraph Evidence Rulings Not Reversible Error.
 

 Second, while we agree that it was also error to admit evidence initially that White refused to take a polygraph, an error corrected during the course of the trial, we do not agree that this error deprived White of a fair trial.
 
 [26]
 
 At trial lead detective Stroze accounted that over a year before White’s arrest, during the officers’ initial interview with him, after a suspicious statement by White, Stroze had asked White to take a polygraph test and he refused. Detective Paar reiterated that account. After the admission of the detectives’ testimony, the trial court recognized its error. White sought and was denied a mistrial, but a curative instruction was given that:
 

 [T]estimony regarding the words polygraph examination were given in this ease. You are instructed to disregard any mention of this matter. It must not be part of your deliberations.
 

 There is a “derivative prohibition against inquiry as to the willingness or reluctance of a party or witness to be the subject of a lie detector examination ... to prove consciousness of innocence or of guilt.”
 
 Johnson v. State,
 
 166 So.2d 798, 801-02 (Fla. 2d DCA 1964); see also
 
 McFadden v. State,
 
 540 So.2d 844, 846 (Fla. 3d DCA 1989) (“Florida cases have taken a more conservative approach to the admission of such testimony.”).
 
 [27]
 
 However “[a] reference to a polygraph ‘is not necessarily prejudicial if no inference as to the result is raised or if any inferences that might be raised as to the result are not prejudicial.’
 
 Hutchins v. State,
 
 834 So.2d 112, 113-14 (Fla. 3d DCA 1976) (citation omitted);
 
 Sullivan v. State,
 
 303 So.2d 632, 635 (Fla.1974).”
 
 Jean v. State,
 
 789 So.2d 550, 551 (Fla. 3d DCA 2001). See
 
 McFadden,
 
 540 So.2d at 846 (“[I]t appears the test was never taken and no results were mentioned nor inferred. Under these circumstances it appears to us that under the law in this state there were no legitimate grounds for mistrial. Certainly, there was no manifest, urgent or absolute necessity in the interests of justice existing here— and that is the test required for a mistrial.”).
 

 In this regard the context of the statement is critical. See Charles W. Ehrhardt, 1 Fla. Prac., Evidence § 401.5, at 172 (2011 ed.) (“Although the mention of polygraph results of a criminal defendant is grounds for a mistrial, not every improper reference to polygraphs is a basis
 
 *345
 
 for such an order. In the latter situation, the factual setting in which the reference occurs must be examined to determine if there exists a ‘manifest, urgent or absolute necessity1 for a mistrial.” (quoting
 
 McFadden,
 
 540 So.2d at 846)). The context of White’s refusal to take the test, combined with the overwhelming evidence of his guilt, including the admissions outlined above, demonstrate that the denial of his motion for mistrial was not an abuse of discretion.
 

 Even if this were not so, the same kind of analysis applied to White’s
 
 Postell
 
 claim leads us to the conclusion that the polygraph evidence beyond a reasonable doubt could not have contributed to the verdict and thus was legally harmless. See
 
 Cooper v. State,
 
 43 So.3d 42, 43 (Fla.2010) (“[T]he test is ‘whether there is a reasonable possibility that the error affected the verdict.’ ” (quoting
 
 State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986))). Thus, any error on this issue as well was harmless.
 

 Affirmed.
 

 [1]
 

 . The trial court sentenced White to consecutive life sentences on Counts 1 and 2; on Counts 3, 4, 5, and 6, to thirty years in prison on each count to run concurrent with each other and with Count 1; and on Counts 7 and 8, to fifteen years on each count, concurrent with each other and consecutive to Count 2.
 

 [2]
 

 . Because a number of White’s claims are either without merit or fail to provide a basis for relief when a harmless error analysis is appropriately applied, we address the only three claims made that we find require extended discussion.
 

 [3]
 

 .DNA from the bandana matched that of co-defendant Armond Davis, who was tried separately and also convicted. See
 
 Davis v. State,
 
 3D11-2536 (Fla. 3d DCA Nov. 9, 2011) (per curiam affirmed).
 

 [4]
 

 . White’s claim that the marijuana arrest was itself invalid is incorrect. See
 
 B.C. v. State, 59
 
 So.3d 321 (Fla. 3d DCA 2011), review denied, 2011 WL 4505964 (Fla. Sept. 28, 2011).
 

 [5]
 

 . Stroze explained that while he requested that the arresting officer transport White immediately, that did not occur:
 

 It wasn’t immediately. They had a thing they were doing, an operation and they put everybody in a holding cell area and then eventually after so many people were rounded up then they were transported from that point on.
 

 [6]
 

 . Turner Guilford Knight Correctional Center is the Pre-Trial Detention Center, a booking facility, which processes and houses all classifications of inmates.
 

 [7]
 

 .At the suppression hearing on questioning of Detective Stroze, the record reflects:
 

 Q. [White’s counsel] Okay so you are going to see Mr. White in your office on December 30th at 6:55 p.m.?
 

 A. [Stroze] 6:55, yes.
 

 Q. 6:55?
 

 Q. And is that after everybody else has been dropped off at TGK?
 

 A. I believe so. I didn’t have anything to do with that part. This is a homicide office.
 

 Q. Now would you agree with me that but for your intervention Mr. White would have been dropped at TGK?
 

 A. Yes.
 

 Q. If he could have made bond he would have bonded out, whatever, correct?
 

 A. That is speculation I don’t know.
 

 [8]
 

 . See
 
 People v. Cipriano,
 
 431 Mich. 315, 429 N.W.2d 781, 785 (1988):
 

 The
 
 McNabb-Mallory
 
 rule was formulated by the United States Supreme Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts....”
 
 McNabb,
 
 supra, 318 U.S. at 341, 63 S.Ct. at 613. Because it was not constitutionally mandated, the rule was never applicable to criminal proceedings in state courts. However, as is true in Michigan, most states require by statute that an arrested person must be arraigned “without unnecessary delay.” In interpreting such statutes, the "vast majority of state courts- [like their federal counterparts] have rejected
 
 McNabb-Mallory
 
 outright, opting instead for a traditional due process voluntariness test of the admissibility of confessions.”
 
 Johnson v. State,
 
 282 Md. 314, 324, 384 A.2d 709 (1978). Under the view adopted in most states, a confession obtained from a suspect in violation of his statutory right to prompt arraignment is not ipso facto inadmissible; rather, arraignment delay is taken into account as one relevant factor in evaluating the overall vol-untariness of the confession.
 

 [9]
 

 . See also
 
 Brown v. State,
 
 715 So.2d 241, 243 (Fla.1998) ("Our courts have long recognized that the rules of construction applicable to statutes also apply to the construction of rules.”) (citations omitted);
 
 Cason ex rel. Saferight v. Hammock,
 
 908 So.2d 512, 516 (Fla. 5th DCA 2005) ("[W]e must apply the rules of statutory construction to the rules of court promulgated by the Florida Supreme Court.”).
 

 [10]
 

 . See
 
 State v. Langley,
 
 61 So.3d 747, 774 (La.App. 3d Cir.2011);
 
 Doyle v. State,
 
 116 Nev. 148, 995 P.2d 465, 470 (2000) ("[A]l-though
 
 Whren
 
 involved a traffic detention, its conclusion that subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis is equally applicable to arrests.”);
 
 Ex parte Scarbrough,
 
 621 So.2d 1006, 1010 (Ala.1993) (tracing courts’ subjective/objective analyses when confronted with claims of pretextual arrests and adopting an objective test, concluding ”[a]s long as the police officer is doing only what is objectively authorized and legally permitted, the officer’s subjective intent in doing it is irrelevant.”); see also
 
 United States v. Jones,
 
 377 F.3d 1313, 1314 (11th Cir.2004) (rejecting defendant’s argument that the arresting officer’s delay in serving the child-support warrant in hopes of arresting defendant while committing a drug-related offense did not support suppression); see generally Margret M. Lawton, The Road To Whren And Beyond: Does The “Would Have” Test Work?, 57 DePaul L. Rev. 917, 926 (2008) ("In the years following
 
 Whren,
 
 the Court has reaffirmed its holding that a police officer's mindset does not have any bearing upon the Fourth Amendment validity of a traffic stop or an arrest based upon objective probable cause.”).
 

 [11]
 

 . In this case there is no evidence that the marijuana arrest was a subterfuge to facilitate questioning White in the murder case.
 

 [12]
 

 . See generally 28 A.L.R. 4th at 1121, 1121 (§ 3, identifying states holding “[bjroad view that delay renders confession inadmissible per se”).
 

 [13]
 

 . See
 
 Rosario,
 
 661 N.E.2d at 74 (footnote omitted) (identifying as factors to be considered in determining the reasonableness of any delay in arraigning a person who has been arrested "(1) whether Miranda warnings were given; (2) the circumstances, including the passage of time between the illegal arrest and the confession; and (3) the purpose and flagrancy of the official
 
 misconduct."
 
 [e.s.]).
 

 [14]
 

 .
 
 U.S. v. Lasley
 
 2011 WL 1630936, 3 (D.Neb. Apr. 29, 2011), explains: "The focus now is with voluntariness rather than delay.”
 

 [15]
 

 .
 
 Wiberg,
 
 296 N.W.2d at 393, went on to conclude: "Rather, the trial court should consider, among other things, how reliable the evidence is, whether the delay was intentional, whether the delay compounded the effects of other police misconduct, and the length of the delay.” However the controlling statute in
 
 Wiberg
 
 specifically required that the defendant "must be brought before a judge without unnecessary delay....”
 
 Id.
 
 at 392.
 

 [16]
 

 .
 
 Keen,
 
 504 So.2d at 400, disapproved in part on other grounds by
 
 Owen,
 
 596 So.2d at 990 (rejecting Keen’s suggestion that an otherwise voluntary statement given after twenty-four hours was per se inadmissible).
 

 [17]
 

 . Although White initially challenged the form of the
 
 Miranda
 
 warnings actually administered to him, he has abandoned that claim in light
 
 Florida v. Powell,
 
 - U.S. -, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (U.S. 2010) and
 
 Rigterink v. State,
 
 66 So.3d 866, 892 (Fla.2011).
 

 [18]
 

 . See, e.g.,
 
 Rowe v. Trombley,
 
 2010 WL 2670652, *10 (July 1, 2010) ("In this case, based on a review of the record, the totality of circumstances indicate that petitioner’s confession was voluntary, in spite of the pre-arraignment delay, because there is no allegation that petitioner was not advised of his
 
 Miranda
 
 warnings, and there is no evidence of intimidating police conduct, that the police interview was coercive, or that petitioner was otherwise harassed or mistreated.”); see also
 
 United States v. Mendoza,
 
 16 Fed.Appx. 770, 771-772 (9th Cir.2001) ("Although pre-ar-raignment delay may be considered by the trial court in determining whether to admit a confession, the "real test” of admissibility is whether the confession was voluntary.”).
 

 [19]
 

 . The TGK website presently provides "If an inmate has bondable charges, he or she can bond out at anytime 24-7, 365 days.” http:// www.miamidade.gov/corrections/corrections_ faq.asp# bondable
 

 [20]
 

 . A magistrate presides over "bond hearings” Monday through Friday at 9:00 a.m. and 1:30 p.m. sessions. On Saturdays and Sundays, there is one 9:00 a.m. session. After booking, an arrested person is ordinarily transported to the justice building, approximately a thirty minute ride, in time for the next session.
 

 [21]
 

 . We reject White's separate claim that the confession was involuntary. See
 
 Perez v. State, 919
 
 So.2d 347 (Fla.2005) (rejecting Perez’ assertion that twenty-five hours, per se required suppression of his statement);
 
 Conde,
 
 860 So.2d at 951-53 (holding confession by defendant not rendered involuntary by separate interrogation periods lasting approximately twelve and thirteen hours each when defendant "was provided food, drink, access to restrooms, the opportunity to place phone calls, and at least eleven hours away from the detectives at a place where he could rest");
 
 Chavez,
 
 832 So.2d at 749 (rejecting Chavez’s arguments for suppression, concluding: "[a]l-though Chavez was questioned over the course of several days, he was provided with food, drink, and cigarettes (as requested) at appropriate times, and permitted to have frequent breaks”).
 

 [22]
 

 . In reviewing a trial court's ruling on a motion to suppress, the evidence developed at a suppression hearing must be interpreted in a manner most favorable to sustaining the ruling of the court below.
 
 Cotton v. State,
 
 901 So.2d 241, 243 (Fla. 3d DCA 2005) (citing
 
 Connor v. State,
 
 803 So.2d 598, 605 (Fla.2001)). The trial court's findings of fact must be accorded a presumption of correctness.
 
 Nelson v. State,
 
 850 So.2d 514, 521 (Fla.2003).
 

 [23]
 

 .During direct examination, the prosecutor asked Detective Paar whether, in December, 1999, "an investigative lead came in that took you in a different direction?” Paar answered, "Yes.” The prosecutor then asked him who the person was that gave Paar the "lead.” White objected on hearsay grounds. At a subsequent side-bar conference, White also objected on the ground that the anticipated testimony would create "the unmistakable inference” that "there is out-of-court information that is not being presented to the jury that led [the detectives] to do certain things under
 
 Postell.”
 
 The prosecutor proffered that the person Paar would say he spoke to that gave police the lead to investigate White as a suspect was Armond Davis, the co-defendant. Defense counsel argued that it would be the same as if part of Davis' statement were ad
 
 *343
 
 mitted into evidence. The prosecutor then withdrew his question of who had given police the information that led to White. White’s counsel then moved to strike Paar’s testimony concerning the "lead” and asked for a curative instruction. However, counsel also argued that White believed that a curative instruction was not sufficient and moved for a mistrial. The court overruled the objection and denied White’s motion for mistrial. Moments later in accounting what he had said at his initial visit to White, Stroze testified he had informed White that they had received information from Davis.
 

 [24]
 

 . See generally
 
 Shere v. State,
 
 579 So.2d 86, 90 (Fla.1991) (finding error in permitting introduction of inadmissible evidence but concluding "under the circumstances of this case, we find the error to be harmless.
 
 The evidence against Shere came largely from his own mouth, including his self-incriminating statements
 
 and the physical evidence which those statements helped to identify” [e.s.]);
 
 Shade v. State
 
 400 So.2d 850, 854 (Fla. 1st DCA 1981) ("The trial court’s failure to exclude the wallet and its contents must be considered to be harmless error, however, in light of the strong evidence of guilt,
 
 not the least of which were appellant’s inculpatory statements which were properly admitted.”
 
 [e.s.]).
 

 [25]
 

 .
 
 Ibid.
 

 [26]
 

 . McCray v. State,
 
 71 So.3d 848, 877 (Fla.2011) (" '[A] trial court’s ruling on a motion for mistrial [is reviewed] under an abuse of discretion standard.’
 
 Salazar v. State,
 
 991 So.2d 364, 371 (Fla.2008). Such a motion should be granted only 'when it is necessary to ensure that the defendant receives a fair trial,'
 
 Cole v. State,
 
 701 So.2d 845, 853 (Fla.1997), and 'when an error is so prejudicial as to vitiate the entire trial,'
 
 England [v. State,
 
 940 So.2d 389, 402 (Fla.2006)].”)
 

 [27]
 

 . Generally, “[ajbsent consent by both the state and defendant, polygraph evidence is inadmissible in an adversary proceeding in this state.”
 
 Walsh v. State,
 
 418 So.2d 1000, 1002 (Fla.1982). This general rule is based on the court’s conclusion that "a polygraph cannot be recognized as a sufficiently reliable or valid instrument to warrant its use.”
 
 Davis v. State,
 
 520 So.2d 572, 573-74 (Fla. 1988).